**UNITED STATES of America**

v.

**Maxie THOMAS and Wilbur Wiggins, Defendants.**

United States District Court
S. D. New York.

Feb. 7, 1966.

Robert M. Morgenthau, U. S. Atty., Southern Dist. of New York, for the Government; John A. Stichter, Asst. U. S. Atty., of counsel.

Anthony F. Marra, Legal Aid Society, New York City, for Wilbur Wiggins; Bernard Moldow, New York City, of counsel.

Edward R. Cunniffe, Jr., New York City, for Maxie Thomas.

TENNEY, District Judge.

Defendants move herein, pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure, to suppress the use of two cartons allegedly seized from them in violation of their Fourth Amendment rights.

Based on the evidence adduced at the hearing, at which both defendants testified, as did the three railroad policemen involved as well as Agent Conlon of the Federal Bureau of Investigation, I find

the following to be the facts (substantially as alleged by the Government):*

In the early evening of Friday, November 5, 1965, at approximately 7:15 P.M., Lt. George Matwijeczko and Patrolmen James Mullarkey and Lonnie Hamilton, all employees of the New York Central Railroad Police Department, were on duty near 11th Avenue and 30th Street in the New York Central Railroad's 10th Avenue Yard, situated between 10th and 12th Avenues and 30th and 32nd Streets, New York City (Gov't's Exh. 1). These three individuals were employed as policemen pursuant to appointments by the Superintendent of the New York State Police, made under Section 88(1) of the New York Railroad Law, McKinney's Consol.Laws, c. 49, and were in possession of cards, or commissions, evidencing their appointment. Their assignment on the evening of November 5th was to patrol the various marshalling yards and trucking platforms situated on New York Central Railroad (hereinafter "Railroad") property within the area bounded by 10th and 12th Avenues and 30th and 37th Streets, New York City. Matwijeczko, Mullarkey and Hamilton (hereinafter collectively referred to as "railroad policemen" or "police") had anywhere from 14 months' to 8 years' service with the Railroad, and had patrolled this same area for a number of years.

These three railroad policemen were thus fully familiar with the physical layout and character of the area, and with the activity or inactivity in this area at all times of the day and night, including Friday evenings. They knew, for instance, that the area was almost entirely deserted at that time of the evening, with no trucking activity and almost no private vehicular or pedestrian traffic. They knew that pedestrian traffic in the area was rare because of the absence of pedestrian attractions or facilities. They also knew from experience that the bulk of the business in that area consisted of the off-loading of perishable foodstuffs from railroad cars into trucks, but that none of this type of work was done on Friday or Saturday. They knew that there was a small amount of trucking done in the area on Friday but that all such work ceased at 5 o'clock on Friday afternoon.

At approximately 7:15 P.M. these three railroad policemen, while sitting in two patrol cars, one marked and one unmarked, in the 10th Avenue Yard, near the corner of 30th Street and 11th Avenue, observed two men (the defendants Thomas and Wiggins) at the southeast corner of 11th Avenue and 30th Street, proceeding on 11th Avenue across 30th Street, each carrying a large and apparently heavy carton. They watched Thomas and Wiggins continue north on the sidewalk on 11th Avenue, immediately above their position in the 10th Avenue Yard.

Upon seeing this, the suspicion of the railroad policemen that something was afoot was aroused. Firstly, they already knew from experience that it was unusual to see any pedestrian traffic at that hour of the evening. Secondly, they knew it was very unusual for anyone in that area to be carrying a carton on the street, regardless of the time of day or night, since cartons were never carried that way, except occasionally from a vehicle into a yard, and if a carton were moved along a street, it was done by handtrucks, not by handcarrying. Accordingly, the three railroad policemen decided to investigate.

Traveling in two cars, one marked and one unmarked, they proceeded out of the yard via a ramp located near the corner of 30th Street and 11th Avenue (the corner where Thomas and Wiggins were first seen) and proceeded north on 11th Avenue until they were abreast of Thomas and Wiggins, who were then on the sidewalk at the northeast corner of 32nd Street and 11th Avenue. Matwijeczko double-parked on 11th Avenue, just south of 32nd Street (location "B" on Govern-

---

* Except where otherwise noted, the evidence is not in substantial conflict. While conflict exists, I find the facts to be as put forth by the Government and contrary to those asserted by defendants.

ment's Exhibit 1), and walked east into 32nd Street and then north to the sidewalk, just east of defendants' locations. Neither car used any siren or flashing light in making this approach.

As the police officers thus approached, Thomas was standing on the sidewalk near a carton (also situated on the sidewalk); Wiggins, however, appeared to have begun running with the carton, and to have then slipped and fallen, whereupon Lt. Matwijeczko assisted him in getting up.

Matwijeczko and Hamilton, dressed in plainclothes, then identified themselves, both orally and by displaying their badges.[1] Mullarkey, who was dressed in his official uniform, did not identify himself.

While all three railroad policemen were carrying guns at the time, at no time did they touch or draw them,[2] and Hamilton demonstrated at the hearing that his gun was not even visible.

Lt. Matwijeczko and Patrolman Mullarkey, separately, then questioned Wiggins and Thomas, respectively.[3] In substance, Wiggins told Lt. Matwijeczko that he and Thomas had found the cartons on the corner of 30th Street and 11th Avenue, that they intended to sell them uptown, and did not have any bills for them.[4] Meanwhile, Thomas first told Mullarkey and Hamilton that they found the cartons at the corner of 31st Street and 11th Avenue, and then, upon being advised that there was no 31st Street in

that area, said they found them at the corner of 30th Street and 11th Avenue.

When Lt. Matwijeczko then asked both of them, in substance, "how about coming to our office and we'll find out who the cartons belong to," Wiggins replied, "sure, we just found them, we got nothing to hide."[5] At no point was a physical restraint put on the defendants or force used.[6]

Based on the evidence, it appears that the railroad policemen knew that Thomas and Wiggins could not have found the cartons at the corner of 30th Street and 11th Avenue. In the first place, Thomas and Wiggins were first seen walking at that corner with the cartons already on their shoulders. Secondly, just a few minutes prior to 7:15 P.M., both Matwijeczko and Mullarkey had driven by that same corner, and neither had seen any cartons; and if they had seen cartons they would have picked them up and returned them to their owner, as they had done on other occasions.

During and after these separate conversations, the railroad policemen observed the outside of the two cartons (Government's Exhibits 2 and 3) which were then resting on the sidewalk near Thomas and Wiggins. In addition to noticing that the two cartons were identical in size and shape, they saw identical printing and labels on the outside of the unopened cartons indicating "Made in Japan", plus a large triangle which encircled various numbers, the meaning of which they did not then understand.

1. Wiggins testified that the officers did not identify themselves at any time.

2. Wiggins testified that two of the officers approached with drawn guns and Thomas testified that "they" had drawn guns. I find the testimony not credible.

3. Both defendants testified that there was no questioning in the street.

4. Thomas testified that he told the policeman in the car that the cartons had been found. Wiggins testified that they were not informed until they were at the railroad office as to why they were being questioned or why they had been arrested. Thomas at first stated

that they had not been informed as to why they were taken to the railroad office, but that in the car he had overheard the police officers discuss the reason for the arrest. At a later point, however, Thomas testfied as follows: " 'Why are you stopping me?' I say, 'I found the package.' Are you going to arrest me for finding something?' "

5. The testimony of the defendants was to the effect that the police told them that they were under arrest and ordered them into the car.

6. Both defendants testified that in addition to the drawn guns they were both frisked on the street.

After agreeing to Lt. Matwijeczko's suggestion about going back to the office, Thomas and Wiggins each picked up a carton and placed it in the rear seat of the unmarked car. Then Thomas, Wiggins, Matwijeczko and Hamilton got in the same car and drove to the office, or locker room, of the New York Central Railroad police, at 34th Street and 12th Avenue, arriving there at approximately 7:30 P.M. Meanwhile, Mullarkey proceeded alone to the same office in the marked car.[7]

When they arrived at the office, Wiggins and Thomas carried the cartons into the office and set them on the table. Upon questioning, Wiggins again stated that they had found the cartons, but said he did not know what was contained in the cartons.[8] Lt. Matwijeczko after saying "Well, let's find out", then tore open one flap of the carton and pulled out one of the items (a china and wrought-iron hot pad). However, he was unable to find a bill of lading. Neither Thomas nor Wiggins voiced any objection to this inspection, and the carton was thereafter left intact.

Being unable to determine the ownership of the cartons, Matwijeczko telephoned Special Agent John M. Conlon of the F.B.I. shortly after 7:30 P.M. He explained to Conlon that he had two men there, explained what the railroad policemen had seen and what had happened up to then, described the carton, told him what Wiggins and Thomas had said about finding the cartons and their intent to sell them, stated he was unable to find out whom the cartons belonged to, and told Conlon that he had not arrested Wiggins and Thomas. Conlon advised Matwijeczko not to arrest Wiggins and

Thomas, not to hold them on Conlon's account, to let Wiggins and Thomas go if they wanted to leave, after taking their names, and to endeavor to ascertain the owner of the goods and whether it was an interstate shipment.

Consequently, Lt. Matwijeczko immediately left the office and returned to the corner of 30th Street and 11th Avenue to investigate the area where Wiggins and Thomas said they found the cartons and to determine their origin, but found nothing at that corner. Eventually he found a person at 29th Street and 11th Avenue who ultimately led Matwijeczko to the premises of the Standard Hauling Company, Inc., located at 29th Street and 11th Avenue, just one block from where Thomas and Wiggins were first seen carrying the cartons. There Matwijeczko discovered a trailer parked in a fashion to permit entry into the rear of the trailer, and inside the trailer Matwijeczko observed other cartons, of the same size and shape, bearing the same markings and numbers as the two cartons which Thomas and Wiggins had been carrying.

As a result, Lt. Matwijeczko telephoned New Jersey and spoke to the president of Standard Hauling Company, Inc., Mr. Albert Wasserman, who agreed to come over to the New York Central Railroad Police Department office in an effort to identify the cartons and produce a bill of lading.

During Lt. Matwijeczko's absence, Wiggins inquired of Mullarkey and Hamilton as to why they weren't being turned over to the city police. Mullarkey advised him that it was because they didn't know where the cartons came from. When Wiggins then asked if he and

---

7. Thomas testified that neither he nor Wiggins touched the cartons after the original stop by the police, and that on the trip to the railroad office the three officers sat in the front seat "laughing and joking" while he and Wiggins sat in the back seat. The officers testified that one sat in the front seat while the second sat in the back with the defendants. I might only note that accepting the defendants' story that they were

told that they were arrested with guns drawn on the street corner, it is incredible that the three officers would sit in the front seat "laughing and joking", leaving both defendants to sit together in the back seat.

8. Except for the fact that they were questioned, very little testimony was elicited from the defendants as to what transpired at the railroad office.

Thomas could go if they couldn't find out where they (the cartons) came from, Mullarkey told him "that's right."

At approximately 8:15 P.M., Matwijeczko returned to his office to wait for Mr. Wasserman's arrival. There he advised both Wiggins and Thomas of his discovery; however, both denied stealing the cartons and repeated their claim that they had found the cartons.

While waiting for Wasserman's arrival, Matwijeczko again spoke by telephone to Conlon. He advised Conlon of his investigation concerning the origin of the cartons, including his discovery of the improperly parked trailer on the premises of Standard Hauling, and of other cartons in that trailer which were identical to those which Wiggins and Thomas were carrying. He also advised Conlon that he had spoken to Wasserman and that Wasserman was on his way to the railroad police office to make a positive identification and to produce a bill of lading. Conlon advised Matwijeczko that he would proceed to the railroad police office after Wasserman made a positive identification and produced the bill of lading establishing the interstate character of the shipment.

During the same period of time, Matwijeczko asked Hamilton to get him, Matwijeczko, some food, whereupon Wiggins and Thomas asked if Hamilton would get some for them as well. Accordingly, Hamilton went to a nearby restaurant and purchased two hamburgers and coffee, each, for Thomas and Wiggins, with money furnished by one of the defendants.

When Wasserman arrived at the railroad office at about 8:45 P.M., he identified the cartons, then obtained from the nearby office of Standard Hauling a bill of lading (Government's Exhibit 4) containing numbers identical to those on the outside of the two cartons and showing that the two cartons were being shipped by Standard from New York City to Washington, D. C. He further explained how the trailer had been improperly parked by one of his men so as to permit entry into the rear of the trailer.

At approximately 9:00 P.M. Matwijeczko again called Conlon and informed him of the positive identification of the cartons, the bill of lading and their interstate character. Conlon advised him that he was on his way down; and at approximately 9:45 P.M. arrived at the railroad police office. Upon arrival, Conlon reviewed the facts with Wasserman and the railroad policemen, looked at the cartons and inspected the bill of lading.

Conlon then interviewed Thomas and then Wiggins, alone. After advising Thomas of his right to counsel, his right to refuse to make any statement and that any statement could be used against him, Thomas gave substantially the same story that he had previously given to the railroad policemen. Conlon asked Thomas if he had any complaints about the way he had been treated, and Thomas said "no",[9] and also asked Thomas if he had any objection to coming over with the railroad policemen to the office, and Thomas said, in substance, no, because they hadn't done anything wrong, they hadn't stolen the cartons, they had just found them.[9] Thomas also told Conlon he and Wiggins didn't want to stay around much longer because they wanted to go home. Conlon advised Thomas he would have to hold them a little while longer, because he might have to arrest them for a violation of Federal law.

During Conlon's interview with Wiggins, Wiggins was also advised of the same rights and gave substantially the same story as previously given to the railroad policemen. However, this interview was relatively brief since Wiggins appeared to be in a distressed state.

After telephoning his office and an Assistant United States Attorney, Agent Conlon advised both Thomas and Wiggins, at approximately 10:45 P.M., that they were under arrest for possession of

---

9. Thomas testified that he "definitely" complained to Conlon, but did confirm the fact that he had told the officers that he and Wiggins had found the cartons.

goods stolen from an interstate shipment.

Thereafter, Thomas and Wiggins were taken to the Federal Detention Headquarters, West Street, New York City, and lodged overnight until their appearance before the Commissioner the next morning.

All three railroad policemen testified that at no time, prior to being told by Conlon that they were under arrest, did either Thomas or Wiggins request, suggest or indicate that they wanted to leave. They were neither told that they were under arrest nor that they were free to leave; nor was any physical restraint, either by guns, handcuffs, or otherwise, exerted on either Thomas or Wiggins. In fact, they all testified that prior to Colon's arrival, besides eating, there was conversation on totally unrelated subjects. The railroad policemen also denied that defendants had been frisked or searched at the corner of 32nd Street and 11th Avenue, where Thomas and Wiggins were first questioned.

With the conflict in testimony resolved, I now proceed to consider the applicable law.

The initial problem confronting the Court is to determine as of what point the defendants were arrested, whether as of that point probable cause existed to arrest them, and, as an incident to those determinations, whether detention for investigation constitutes an arrest.

The defendants do not contend that as of 10:45 P.M. when Agent Conlon "for-mally" arrested them, the standard of probable cause, requisite for an arrest without a warrant (see Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed. 2d 134 (1959)), was not met. They rather assert that they were arrested at some point after the initial encounter with the railroad policemen and probably at the point that they entered the police car to go to the railroad police office. In support of their argument they cite Henry v. United States, supra, as being dispositive, and press the Court to adopt the classical definition of arrest, namely, that once liberty of movement is restricted, an arrest has been effected.[10] "To determine whether an arrest has taken place we look to the facts to see if there has been 'an actual restraint of the person.'" Foote, The Fourth Amendment: Obstacle or Necessity in the Law of Arrest? 51 J.Crim.L., C. & P.S. 402, 403 (1960); see People v. Esposito, 118 Misc. 867, 194 N.Y.S. 326, 332 (Ct.Spec.Sess. 1922); see generally, Ronayne, The Right to Investigate & New York's "Stop & Frisk" Law, 33 Fordham L.Rev. 211, 212–13 (1964).

To accept the defendants' argument would mean that every stopping by the police—in effect, restricting freedom of movement—constitutes an arrest.[11]

" * * * If that were the case, police investigation would be dealt a crippling blow, by imposing a radical sanction unnecessary for the protection of a free citizenry." United States v. Bonanno, 180 F.Supp. 71, 78 (S.D.N.Y.), rev'd

---

10. I leave to the side the issue of whether the defendants voluntarily entered the police car.

11. The defendants somewhat inconsistently concede that the police can stop—but this concession negates the classical and absolute definition of arrest. Indeed, Professor Foote, the leading proponent of this absolute definition, in his article in Volume 51 of the Journal of Criminal Law, Criminology & Political Science, supra, somewhat inconsistently concedes that in certain situations (such as persons in the vicinity of a corpse or a roadblock in the area of a kidnapping), a right to question and detain exists since "the reasonableness of the police action is conditioned by an immediate crisis * * *." (Id. at 408.) And he would thus be of the view that "[n]arrowly drawn exceptions to the requirement of probable cause to cover such emergencies would have great merit * * *." (Ibid.) To concede the above, however, is to admit that every restriction of freedom of movement is not an arrest and that in certain situations it is warranted. If this be conceded then the dispute is removed from the constitutional realm and is placed in its proper setting, to wit, the propriety of police action weighed in the totality of circumstances presented.

on other grounds sub nom. United States v. Bufalino, 285 F.2d 408 (2d Cir. 1960) (hereinafter cited to the District Court opinion).

Thus "[w]hile the Fourth Amendment may be construed as encompassing 'seizure' of an individual, it cannot be contended that every detention of an individual is such a 'seizure'". (Ibid.) Accordingly, "every temporary restriction of absolute freedom of movement is not an illegal police action demanding suppression of all resultant evidence * * *." (Ibid.)

In line with Judge Kaufman's observation that every detention does not constitute a seizure, it should be noted that what the Constitution bans is unreasonable seizures, and that the interpretation of the word "unreasonable" is dependent on the circumstances under which it is brought into play. Thus it has been suggested that since "reasonable" detention constitutes a lesser seizure than an arrest (and accordingly a lesser seizure than that contemplated by the probable cause standard) a lesser justification is necessary in order for it to be considered reasonable. See Comment, Police Power to Stop, Frisk & Question Suspicious Persons, 65 Colum.L.Rev. 848, 858 (1965):

"* * * The adjective 'unreasonable' chameleon-like adopts coloration from its surroundings. (That which is 'reasonable' beach attire is likely to be highly 'unreasonable' church finery.) Common sense would seem to dictate that as we diminish the concept of 'seizure' from one of *arrest* with the heavy burden that it carries to one of the briefest *stopping* entailing at most minor inconvenience, the Constitution should not be offended if simultaneously fewer and less weighty reasons are required to justify the police action. Sparse circumstances sufficient to render a *stopping* 'reasonable' may well be found 'unreasonable' justification for the more lasting inconvenient and significant *arrest*." Kuh, Reflections on New York's "Stop-&-Frisk" Law and Its Claimed Unconstitutionality, 56 J.Crim.L., C. & P.S. 32, 35

(1965); see Bator & Vorenberg-Arrest, Detention, Interrogation & the Right to Counsel: Basic Problems & Possible Legislative Solutions, 66 Colum.L.Rev. 62, 65–66 (1966); LaFave, Arrest, 346 n. 14 (1965).

"* * * Would not the policy of the Fourth Amendment be better served by an approach which determines the reasonableness of each investigative technique by balancing the seriousness of the suspected crime and the degree of reasonable suspicion possessed by the police against the invasion of the personal security and property rights of the individual involved?" Barrett, Personal Rights, Property Rights & The Fourth Amendment, 1960, Supreme Court Review 46, 63 (Kurland ed.). "For purposes of the exclusionary rule we should forget the technicalities of arrest law and think in terms of the reasonableness of the detention. Arguably, stopping a car to ask the occupants a few questions is not a seizure of their persons. Even if it is, the constitutional issue is not whether they were arrested with or without reasonable cause. The constitutional question is whether the seizure of their persons was reasonable. If the Courts would emphasize the reasonableness of the search or seizure instead of the technicalities of arrest law, it might be easier to develop workable rules for the guidance of the peace officers." Collings, Toward More Workable Rules of Search & Seizure—An Amicus Curiae Brief, 50 Calif.L.Rev. 421, 437 (1962).

Accordingly, irrespective of whether the stop is viewed as a lesser species of arrest and therefore not a seizure within the meaning of the Fourth Amendment (see United States v. Bonanno, supra), or being a lesser species of arrest it can be justified on a showing of something less than probable cause (see articles cited above), or its propriety in any event is to be determined by what is reasonable under the circumstances, the mere act of stopping by a policeman does not *ipso facto* constitute the arrest envisaged by the Fourth Amendment re-

quirement of probable cause. See Note, 78 Harv.L.Rev. 473, 474–76 (1964).

The more logical approach and more workable approach is not to draw an arbitrary cut-off point, but rather to view the totality of circumstances, and determine as a question of fact as of what point the defendant was arrested. See Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960).

I might further observe that the act of restricting the defendants' freedom of movement (whether by stopping or detaining) did not constitute a technical arrest either, since both the common law [12] and New York statutory [13] definition of arrest require the taking of a person into custody that he may be held to answer for a crime. "It is clear that a technical arrest demands an intent on the part of the arresting officer to bring in a person so that he might be put through the steps preliminary to answering for a crime such as fingerprinting, booking, arraigning, etc." United States v. Bonanno, supra, 180 F.Supp. at 77.

Similarly, stopping, questioning and even detention do not "satisfy the requirements of what might be termed the 'common' definition of arrest. A layman, if asked if he had even [sic] been arrested, would not be likely to describe situations where he had been stopped by a police officer, or situations where his car had been stopped, or even situations where his questioning had been continued at a police station, as arrests. The common conception of an arrest, like the technical definition, comprehends the formal charging with a crime." (Id. at 78) [14]

Nor does Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), detract from this analysis. If Henry can be read as holding that every stopping and consequent restriction of freedom of movement is an arrest, then I must candidly note that the rule of Henry is more "honour'd in the breach than the observance." (Hamlet, Act 4, Scene 1.) See, e. g., Davis v. People of State of Cal., 341 F.2d 982, 986 (9th Cir. 1965); United States v. Vita, 294 F.2d 524, 530 (2d Cir. 1961), cert. denied, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed. 2d 788 (1962); Bell v. United States, 108 U.S.App.D.C. 169, 280 F.2d 717 (1960) (Per curiam); United States v. Bonanno, supra; cf., United States v. Middleton, 344 F.2d 78, 83 (2d Cir. 1965).

In any event, the Henry decision has been interpreted as turning on the Government's concession in both the trial and appellate court, that the arrest took place at the time that the car was stopped (see Busby v. United States, 296 F.2d 328, 331 (9th Cir. 1961), cert. denied, 369 U.S. 876, 82 S.Ct. 1147, 8 L.Ed.2d 278 (1962); United States ex rel. Alexander v. Fay, 237 F.Supp. 142, 148 (S.D.N.Y. 1965); United States v. Bonanno, supra, 180 F.Supp. at 85), a concession made since certiorari had already been granted in Rios v. United States, 359 U.S. 965, 79 S.Ct. 881, 3 L.Ed.2d 833 (1959) vacated and remanded, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960) (see Henry v. United States, supra, 361 U.S. at 103 n. 7, 80 S.Ct. 168), a case wherein the Government was arguing that the "limited detention involved in making inquiry is not an arrest; [and thus] its propriety must be judged by reasonableness under all the circumstances." (Government Brief, Rios v. United States at 25; see id. at 11, 22–39.) [15]

12. 4, Blackstone Commentaries, * 289 (Sharswood ed. 1873).

13. Section 167 of the New York Code of Criminal Procedure.

14. The practical and important differences, to the person affected, between an arrest denominated as such and a period of detention will be noted infra at note 28. See generally, LaFave, Deten-

tion for Investigation By the Police: An Analysis of Current Practices, 1962 Wash. U.L.Q. 331, 362–64.

15. Even assuming that Henry does in fact mandate a finding that all restriction of movement is an arrest and that, accordingly, when federal agents restrict movement an arrest has been effected, doubt has been expresesd as to whether

In sum, having held that a stop does not *ipso facto* by reason of some mechanical formula constitute an arrest, I now proceed to discuss the circumstances under which such action can be taken.

■ Both at common law [16] and under the decisional law of the various states with [17] and without [18] statutory authority, the police have been found to be possessed of a clearly though perhaps nar-

the entire body of federal search and seizure law is now binding on the states by reason of the decision in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L. Ed.2d 1081 (1961).

In People v. Mickelson, 59 Cal.2d 448, 30 Cal.Rptr. 18, 380 P.2d 658 (1963). Justice Traynor held that a state rule authorizing a brief on-the-street detention does not violate the Federal Constitution and that a state rule governing police procedure is not unconstitutional merely because it permits conduct in which a federal officer may not lawfully engage.

In language apposite to the problem presented herein, Justice Traynor then held:

"We do not believe that our rule permitting temporary detention for questioning conflicts with the Fourth Amendment. It strikes a balance between a person's interest in immunity from police interference and the community's interest in law enforcement. It wards off pressure to equate reasonable cause to investigate with reasonable cause to arrest, thus protecting the innocent from the risk of arrest when no more than reasonable investigation is justified. (See Barrett, Personal Rights, Property Rights, and The Fourth Amendment, 1960 Sup. Ct.Rev. 46, 65–66, 69–70.) The United States Supreme Court apparently concluded that the situations presented in the Henry, Rios, and Brinegar cases allowed no middle ground (see dissenting opinion of Jackson, J. in Brinegar v. United States, 338 U.S. 160, 183, 69 S.Ct. 1302, 93 L.Ed. 1879) and hence that the officers were not justified in stopping the defendants' automobiles unless they had probable cause to make arrests. It does not follow that its conclusion was constitutionally compelled. Given the absence of legislation, the Court had to articulate the governing rule and enforce compliance with it. It did not thereby foreclose Congress or the states from articulating other reasonable rules consistent with the Fourth Amendment." 30 Cal. Rptr. at 20–21; 380 P.2d at 660–661; see Commonwealth v. Lehan, 347 Mass. 197, 196 N.E.2d 840, 844 (Sup.Jud.Ct. 1964) ; People v. Rivera, 14 N.Y.2d 441, 252 N.Y.S.2d 458, 201 N.E.2d 32 (1964),

cert. denied, 379 U.S. 978, 85 S.Ct. 679, 13 L.Ed.2d 568 (1965) (By Implication). See generally, Friendly, The Bill of Rights as a Code of Criminal Procedure, 53 Calif.L.Rev. 929 (1965) ; Collings, supra, 50 Calif.L.Rev. at 458.

16. In Lawrene v. Hedger, 3 Taunt. 13, 128 Eng.Rep. 6 (C.P. 1810), the plaintiff in a false imprisonment action, while walking through the streets of London at 10:00 in the evening with a bundle in his hand, was stopped and questioned by a watchman and when he failed to give a proper account of himself was placed in jail until morning.

The Court upheld the power of the watchman to detain when there is "reasonable ground to suspect" a crime thusly: "[I]n the night when the town is asleep and it is the especial duty of these watchmen and other officers to guard against malefactors, it is highly necessary that they should have such a power of detention. And in this case what do you talk of groundless suspicion? There was abundant ground of suspicion here. We should be very sorry if the law were otherwise." 128 Eng.Rep. at 7. See generally, United States v. Vita, supra, 294 F.2d at 530; People v. Rivera, supra, 14 N.Y.2d at 445–446, 252 N.Y.S. 2d at 462, 201 N.E.2d at 34–35; Leagre, The Fourth Amendment & The Law of Arrest, 54 J.Crim.L., C. & P.S. 393, 408–11 (1963) ; Ronayne, supra, 33 Fordham L.Rev. at 213–15.

17. Del.Code Ann. tit. 11 §§ 1901–1912 (1953) ; N.H.Rev.Stat.Ann. 594:1–594:25 (1955) ; R.I.Gen.Laws Ann. §§ 12–7–1 to 12–7–13 (1956). These statutes are substantially the same as the Uniform Arrest Act, the text of which can be found in Warner, The Uniform Arrest Act, 28 Va.L.Rev. 315, 344 et seq. (1942). Other states have enacted somewhat similar statutes, though they have not adopted the Uniform Arrest Act. See Ronayne, supra, 33 Fordham L.Rev. at 215 n. 28.

18. People v. Rivera, supra; Ronayne, supra, 33 Fordham L.Rev. at 219–22; Goss v. State, 390 P.2d 220 (S.Ct. Alaska), cert. denied, 379 U.S. 859, 85 S.Ct. 118, 13 L.Ed.2d 62 (1964) ; State ex rel. Branchaud v. Hedman, 269 Minn. 375, 130 N.W.2d 628 (1964) ; State v. Hope, 85 N.J.Super. 551, 205 A.2d 457 (App. Div. 1964) ; City of South Euclid v. Di

rowly defined power to stop and question (and frisk, though such is not the case herein) and even detain persons, under certain circumstances.

■■ Under the law of New York [19] a police officer [20] may stop "any person abroad in a public place whom [the police officer] reasonably suspects is committing, has committed or is about to commit a felony or any of the crimes specified in section five hundred fifty-two of this chapter, and may demand * * * an explanation of his actions." (New York Code of Criminal Procedure, Section 180–a(1)).

In People v. Rivera, 14 N.Y.2d 441, 252 N.Y.S.2d 458, 201 N.E.2d 32 (1964), cert. denied, 379 U.S. 978, 85 S.Ct. 679, 13 L.Ed.2d 568 (1965), the New York Court of Appeals, without reliance on the statutory enactment, held that "[t]he authority of the police to stop [a] defendant and question him in the circumstances shown is perfectly clear. The business of the police is to prevent crime if they can. Prompt inquiry into suspicious or unusual street action is an indispensable police power in the orderly government of large urban communities. It is a prime function of city police to be alert to things going wrong in the streets; if they were denied the right of summary inquiry a normal power and a necessary duty would be closed off." 14 N.Y.2d at 444–445, 252 N.Y.S.2d at 461, 201 N.E.2d at 34. Accord, People v. Cassese, 47 Misc.2d 1031, 263 N.Y.S.2d 734 (Crim.Ct.1965).

Indeed, Judge Fuld in his dissenting opinion had "no doubt that the police, in the proper performance of their duties have a responsibility to investigate suspicious activity and that one permissible form of investigation is the temporary stopping and questioning of individuals so engaged." 14 N.Y.2d 448 at 451, 252 N.Y.S.2d 464 at 467, 201 N.E.2d at 38.

I might note parenthetically, however, that in the case at bar, according to the testimony of both the defendants and the police, there was no stopping, since at the time the officers approached both defendants were standing on the corner, either by the curb or on the street, but nonetheless standing. See Bowling v. United States, 350 F.2d 1002, 1003 (D.C.Cir.

Franco, 4 Ohio Misc. 148, 206 N.E.2d 432 (Munic.Ct.1965).

19. We are here dealing with the propriety of New York Railroad police conduct *prior* to a formal arrest and whether that conduct amounted to a formal arrest, and accordingly both statutory and common law authority will be cited to support this conduct. See United States v. Di Re, 332 U.S. 581, 589, 68 S.Ct. 222, 92 L.Ed. 210 (1948); United States v. Viale, 312 F.2d 595, 600 (2d Cir.), cert. denied, 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199 (1963); United States v. Bonanno, supra, 180 F.Supp. at 77 n. 10; compare United States v. Vita, supra, 294 F.2d at 530 n. 2.

20. The railroad police are appointed pursuant to Section 88 of the New York Railroad Law (Supp.1965) which, in pertinent part, provides:

"1. Upon the application of any corporation owning or operating a railroad, * * * the superintendent of state police may appoint any person as a policeman, with all the powers of a policeman in cities and villages, for the preservation of order and of the public peace, and the arrest of all persons committing offenses upon the land of or upon property in the custody of or under the control of such corporation * * *.

* * * * *

6. No person shall be granted an appointment as a police officer under this section unless and until the corporation * * * making application shall certify * * * that the proposed appointee has had the minimum police training required for local police officers by the municipal police training council of the office of local government, executive department, state of New York * * *.

* * * * *

14. A person appointed policeman under this section shall not * * * perform any service for the corporation * * * in any other capacity other than that of policeman and he shall not be permitted to exercise the duties or functions of a policeman except upon the proprety or in connection with the property connected with or under the control of the corporation * * *, for which he has been appointed."

1965); Sobel, Recurrent Problems in Search & Seizure (Selected Materials on New York Criminal Law Practice) at 2–52 (Practicing Law Institute 1965).

In any event, were the circumstances present in the case at bar sufficient to fall within the statutory standard of "reasonably suspects" so as to authorize a restraint in freedom of movement?

The first problem is defining the words "reasonably suspects." Is the standard any more nebulous than "probable cause" so as to relegate the Court to a reliance solely on the subjective state of mind of the police officer? (See Foote, supra, 51 J.Crim.L., C. & P.S. at 407.) I think not. See Porter v. Wilson, 245 F.Supp. 396 (N.D.Calif.1965).

That the standard entails a lesser quantum of proof than "reasonable cause to believe" cannot be doubted, for if the quantum be the same there would be no need for a new statutory enactment, since if "reasonable cause to believe" exists, an arrest can be effected under traditional arrest law and there is no need for a period of detention for investigation. See Foote, supra, at 403. But see De Salvatore v. State, 52 Del. 550, 163 A.2d 244 (1960).

■ The use of the word suspects "will indicate that it is simply a step down from the word 'believes.' It should be just as susceptible of legal usage as has been the more common word [believes]. 'Believes' concededly connotes a greater depth of certainty *on the part of the actor* but the word itself is no more fixed, no more inflexible than is the word 'suspects.' In brief, 'reasonably suspects' as used in the 'Stop-and-Frisk' statute refers to a conglomerate of such

circumstances as would merit the sound suspicions of a properly alert policeman performing his sworn duty." Kuh, supra, 56 J.Crim.L., C. & P.S. at 33; see Comment, Probable Cause Held Not Requisite for Stop & Frisk, 39 N.Y.U.L. Rev. 1093, 1095 n. 24 (1964).

■ Since the consequences of a stop and detention are less serious than those of arrest, and a stop and detention a lesser form of seizure, the requisite showing to justify its imposition is accordingly lesser as well. See People v. Rivera, supra, 14 N.Y.2d at 445, 252 N.Y.S.2d at 461, 201 N.E.2d at 34; People v. Peters, 44 Misc.2d 470, 254 N.Y.S.2d 10 (County Court 1964).

While it is thus clear that a lesser quantum of proof is necessary, how is the standard of "reasonably suspects" to be defined?

"In order for a detention to be valid the officer must reasonably and in good faith suspect the individual detained of being involved in some form of criminality. A mere good faith suspicion will not suffice; it must be such that a reasonable man would also entertain it. However, it is not necessary for an officer to have a specific crime in mind or if he does to believe that the person detained probably committed it. Suspicion in this context means that it must be reasonably possible that the individual has committed some crime." Leagre, The Fourth Amendment & The Law of Arrest, 54 J.Crim.L., C. & P.S., 395, 413 (1963).

■ Applying these criteria to the facts presented to these railroad policemen, did they reasonably suspect that a felony [21] had been, was being or was

---

21. That it ultimately developed that the crime (larceny) for which the state authorities could have prosecuted defendants was a misdemeanor—i. e., that the cartons contained products of a value less than $100—should be of no consequence so long as at the time of the stop and question and detain the officer reasonably suspected that a felony had been, was in the process of being, or was about to be committed. Cf., Maghan v. Jerome, 67 App.D.C. 9, 88 F.2d 1001 (1937); see

also People v. Anonymous, 265 N.Y.S.2d 705 (Nassau County Ct., 1965, per Kolbrener, J.); but cf., People v. Estrialgo, 37 Misc.2d 264, 233 N.Y.S.2d 558, 556 (S.Ct.1962), rev'd, 19 A.D.2d 509, 245 N.Y.S.2d 850 (2d Dep't 1963) (Mem.), aff'd, 14 N.Y.2d 733, 250 N.Y.S.2d 293, 199 N.E.2d 384 (1964) (Mem.).

Indeed, due to the close proximity to the railroad yards there may have been reasonable suspicion that the crime of grand larceny had been committed (New York

about to be committed? As is obvious, especially in this area, each case stands or falls on its own particular facts and circumstances (see Harris v. Tahash, 353 F.2d 119, 122 (8th Cir. 1965)), and the presence or absence of one fact will oftentime mean the difference between a finding of reasonable suspicion and an absence of such a finding. See People v. Anonymous, 265 N.Y.S.2d 705 (Nassau County Ct. 1965, per Kolbrener, J.); cf., United States v. Duffy, 250 F.Supp. 900 (S.D.N.Y.1965, per Croake, J.).

In determining the reasonableness of the initial questioning, the qualifications, knowledge and experience of the railroad policemen is quite relevant, Bell v. United States, 102 U.S.App.D.C. 383, 254 F.2d 82, 86, cert. denied, 358 U.S. 885, 79 S.Ct. 126, 3 L.Ed.2d 113 (1958); cf., Ronayne, supra, 33 Fordham L.Rev. at 235–36, and the circumstances presented to them must be evaluated not from the remote vantage point of the library but rather from the viewpoint of a prudent and cautious police officer on the scene. Jackson v. United States, 112 U.S.App.D.C. 260, 302 F.2d 194, 196 (1962). As railroad policemen, with experience varying from 14 months to 8 years, their duties were to protect all property of the New York Central Railroad. Their specific assignment on the evening of November 5, 1965 was to patrol the various marshalling yards and platforms situated on railroad property in the area bounded by 10th and 12th Avenues and 30th and 37th Streets, New York City, an area they had patrolled for a number of years.

Based on past experience, the railroad policemen had reasonable grounds to suspect that a crime had been or was being committed when they first observed Wiggins and Thomas carrying two heavy cartons at 30th Street and 11th Avenue. They knew from experience that (a) the type of business (perishable foods) conducted in that area ceased entirely at 5:00 P.M. on Friday evenings; (b) after that time the area was deserted; (c) pedestrian and vehicular traffic in the area were rare at that time of the evening, by reason of the absence of business activity and pedestrian attractions; (d) it was unusual to see anyone physically carrying cartons on the public street in that area at any time since nearly all movements of cartons were effectuated by machine or handtrucks, and then only within yards or from the street into a yard, not along the public street. In addition, the railroad policemen had good reason to believe that the cartons had come from railroad property since defendants were first seen just across the street from railroad property.

These factors clearly met all the prerequisites for legal stoppage for investigation which the Court enunciated in United States v. Bonanno, supra, 180 F.Supp. at 80. "(1) [b]elief by the officer involved that a crime might have been committed; (2) reasonable grounds for such a belief and (3) absolute necessity for immediate investigatory activity."

In addition, upon being approached, Wiggins appeared to be running, a factor of considerable importance in determining probable cause (Green v. United States, 104 U.S.App.D.C. 23, 259 F.2d 180, 182 (1958); United States v. Heitner, 149 F.2d 105, 107 (2d Cir.), cert. denied, Cryne v. United States, 326 U.S. 727, 66 S.Ct. 33, 90 L.Ed. 432 (1945)), and of even greater significance in satisfying the lesser standard of reasonable suspicion.

When asked where they had gotten the cartons, Wiggins in substance said they had found them on the corner of 30th Street and 11th Avenue, that they had no bills for them and intended to sell them

Penal Law McKinney's Consol.Laws, c. 40, Section 1294(2)) or one of the misdemeanors enumerated in Section 180–a (to wit, receiving stolen property—as set forth in Section 552 of the New York Code of Criminal Procedure).

In any event, I hold that the stop was authorized.

uptown. Thomas, at first, said that they had found the cartons on the corner of 31st Street and 11th Avenue, and then, upon being advised that there was no 31st Street corner, stated that the cartons had been found on 30th Street and 11th Avenue.

■ As heretofore observed, the answers were false and known to the officers to be false. Extensive citation is unnecessary to support the proposition that a false answer is of significance in considering the totality of circumstances presented to the officers. Bell v. United States, 108 U.S.App.D.C. 169, 280 F.2d 717, 718–719 (1960) (Per curiam); Bell v. United States, 102 U.S.App.D.C. 383, 254 F.2d 82, 87, cert. denied, 358 U.S. 885, 79 S.Ct. 126, 3 L.Ed.2d 113 (1958); People v. Brady, 16 N.Y.2d 186, 264 N.Y.S.2d 361, 211 N.E.2d 815 (1965).[22]

Based on these circumstances, the railroad policemen were entirely justified in approaching these defendants and questioning them—and if there was a "stop" that in fact restricted their freedom of movement—and in stopping them as well. (See Commonwealth v. Lehan, 347 Mass. 197, 196 N.E.2d 840 (Sup.Jud.Ct. 1964);

Commonwealth v. Roy, 207 N.E.2d 284, 286–287 (Mass.Sup.Jud.Ct.1965)). When questioned, the defendants' answers were not only unsatisfactory but were false and known to the officers to be false. The officers knew that the cartons did not belong to the defendants, because the defendants had so stated and they were unable to establish on the spot whose property was involved—the railroad's or someone else's.

■ In addition, the defendants stated that they intended to dispose of the cartons "uptown", presumably as soon as possible, (rather than turn them over to the police as it was their duty to do).[23] Faced with these highly suspicious circumstances and with the admitted fact that the defendants intended to dispose of the cartons, it was imperative for the railroad police, in the proper performance of their duties, to investigate both the origin of the cartons and the method by which they had come into the possession of the defendants and to detain the defendants if need be during a reasonable period of investigation.[24] To this end, Lt. Matwijeczko asked both defendants in substance "how about coming

22. Of additional weight is the observation by the railroad police of the markings on the cartons "Made in Japan", indicating a foreign or interstate shipment (see United States v. Sorce, 325 F.2d 84, 86 (7th Cir. 1963), cert. denied, 376 U.S. 931, 84 S.Ct. 701, 11 L.Ed.2d 651 (1964)), and furnishing reasonable grounds for suspicion that railroad property was involved.

23. See New York City Administrative Code § 435–4.1; New York Penal Code, Section 1300.

24. The Government presses as an alternative to the detention theory that if it be found that the defendants were in fact arrested on the street, the arrest was valid under Section 183 of the New York Code of Criminal Procedure.

The Government may well be justified in asserting that based on the factors above alluded to the railroad police "actually observed acts [and heard statements] which were in themselves sufficiently indicative of a crime being in the course of commission * * *.'"

United States v. Viale, 312 F.2d 595, 600 (2d Cir.), cert. denied, 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199 (1963); People v. Moore, 11 N.Y.2d 271, 272, 228 N.Y.S.2d 822, 823, 183 N.E.2d 225 (1962). And that accordingly, they were fully justified in arresting the defendants "[f]or a crime [appropriation of found property— Section 1300 of the New York Penal Law] committed or attempted in [their] presence." (Section 183(1) of the New York Code of Criminal Procedure.) See Pigg v. United States, 337 F.2d 302, 306 (8th Cir. 1964) (Dissenting opinion per Ridge, J.); cf., State v. Harris, 265 Minn. 260, 121 N.W.2d 327, 334, cert. denied 375 U.S. 867, 84 S.Ct. 141, 11 L. Ed.2d 94 (1963), approved, Harris v. Tahash, 353 F.2d 119 (8th Cir. 1965).

However, appealing as this theory may be, I would prefer to rest my decision on the power of the police under appropriate circumstances to stop, question and detain; a power recognized at common law, modern statutory and case law and a line of Second Circuit decisions.

to our office and we'll find out who the cartons belong to", to which Wiggins replied: "sure, we just found them, we got nothing to hide." [25]

25. While I am not basing my decision herein on consent, I do not think it so clear that the Government has not sustained its burden of showing that the defendants did not in fact voluntarily go with the railroad police. In fact, when Agent Conlon interviewed Thomas, the latter stated that he had no objection to coming over to the railroad office since they (Thomas and Wiggins) "had nothing to hide; they just found the cartons and hadn't stolen them." Since I have attached no weight to the testimony of the defendants that they were approached with drawn guns and frisked and ordered into the car, the fact that both now testify that they did not want to go with the police and that no one asked them if they consented to go, is similarly entitled to no weight. What is of some importance, though far from determinative, is the fact that neither Thomas nor Wiggins, either by word or action, voiced any objection to Lt. Matwijeczko's suggestion and in fact verbally consented to it.

It is well established that consents to search are not to be lightly inferred (United States v. Viale, supra, 312 F.2d at 601) and a consent is not voluntary if it is the product of duress or coercion, actual or implied. United States v. Smith, 308 F.2d 657, 663 (2d Cir. 1962), cert. denied, 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed. 2d 716 (1963).

The mere presence of police officers, of course, does not in and of itself remove all power to freely consent. See United States v. Rutheiser, 203 F.Supp. 891, 892 (S.D.N.Y.1962).

While the failure to argue or object has been held to be of little significance (see People v. Abramson, 40 Misc.2d 723, 243 N.Y.S.2d 819 (S.Ct.1963); see also, United States v. Duffy, 65 Cr. 55 (S.D. N.Y 6/30/65, per Croake, J); but see, State v. Harris, note 24, supra, 121 N.W. 2d at 334; see also, Fisher v. United States, 324 F.2d 775, 777 (8th Cir.), cert. denied, 377 U.S. 999, 84 S.Ct. 1935, 12 L.Ed.2d 1049 (1964)), in the case at bar the failure to remonstrate must be taken in conjunction with the affirmative statement in answer to the policeman's request: "sure I have nothing to hide." (But see Cipres v. United States, 343 F. 2d 95, 97 nn. 2 & 3 (9th Cir. 1965) and cases cited therein; compare Davis v. People, of State of Cal., 341 F.2d 982 (9th Cir. 1965)).

As is obvious from the above-cited cases, seemingly conflicting with each other, each case stands or falls on its own particular facts based on the totality of circumstances and the credibility of the witnesses.

Thus, for example, in United States v. Thompson, 356 F.2d 216 (2d Cir. 12/6/65), the police, after knocking on defendant's door, told him by house 'phone that they would like to speak to him. The defendant answered all right and opened the door, stating come on in, and in response to a request for permission to look around, he said: "go ahead." Upon entering the room, the police saw a money bag protruding from a bureau dresser drawer, and upon request the defendant also pointed to a gun under the bed.

In upholding the search based on consent, the Court, after intoning the general principles above alluded to, stated:

"Appellant need not have had a positive desire that the search be conducted in order for his consent to have been voluntary and effective. He had three opportunities to object to the entrance and search by the police. * * * The record is devoid of any evidence of displeasure on his part. Nor was there any evidence of exhaustive questioning, persistent demands or coercive action on the part of the police.

Appellant testified, at the hearing before trial on the motion to suppress, that he did not object because it would have been ineffectual. From our perspective his permissive attitude may seem foolhardy; it is on this basis that we are asked to draw an inference of coercion. Perhaps there is a coercive effect inherently produced when several police officers, with their uniforms and accompanying paraphernalia, confront a suspect and ask for permission to search. To sustain such a claim of coercion, absent any coercive words or acts by the police, would preclude a voluntary consent to search whenever more than one armed police officer confront a suspect; it is only their number, their equipment and the fact they were police that appellant claims adds up to coercion. We refuse to so hold.

Appellant had to make a hurried choice. * * * It is irrelevant whether appellant consented in the hope that the officers were only routinely checking the hotel and would move on, or because he believed the police had caught up with him and his best course would be to cooperate. In either circumstance his consent was 'unequivocal,

Having sustained the right of the officers to stop and question, were they, in view of the answers given, empowered to further detain the defendants for the purposes of investigation?

The New York statute (Section 180–a of the New York Code of Criminal Procedure) is similar to the provision in Massachusetts (Mass.Ann. Laws ch. 41, § 98 (1961)) in that it does not by its terms authorize a detention for any specific length of time. The Massachusetts statute, however, expressly authorizes a formal arrest if the officer is not satisfied with the suspect's explanation of his conduct, whereas the New York Act does not of itself speak to the question of what to do with the detained person who remains suspect. The Uniform Arrest Act authorizes detention and further questioning for as long as two hours. Del. Code Ann. tit. 11, § 1902 (1953); R.I. Gen. Laws Ann. § 12–7–1 (1956). The New Hampshire statute (N.H.Rev.Stat. Ann. 594:2 (1955)), authorizes detention for up to four hours. See Nelson v. Hancock, 239 F.Supp. 857 (D.N.H.1965).

■ While one commentator intimates that the Legislature of New York, by failure to specify a period of detention, may have withdrawn that right (see Kuh, supra, 56 J.Crim.L., C. & P. S. at 34–35), I cannot subscribe to such an interpretation. The more reasonable interpretation is that the Legislature, by failing to include a specific detention period, neither sought to give nor to deny such a right but rather left the police to their common law right existent prior to the statute. See People v. Hoffman, 24

specific and intelligently given.'" (Id. at 220.)

In United States v. Gorman, 355 F.2d 151 (2d Cir. 12/7/65), the Court found consent where agents after having been voluntarily admitted into the defendant's room, and asking whether the defendant had any objection to their looking into his luggage to which defendant responded, "Be my guest", found a revolver in one suitcase and several packages of money in another. When one of the agents remarked: "You have been kidding us", the defendant responded: "What else could I do."

A consent under these circumstances has been described thusly:

"Consent is simply never 'probable' when the consentor knows that the police will find the incriminating product by the search." Sobel, Current Problems in the Law of Search & Seizure at 129–30 (1964).

"[N]o sane man who denies his guilt would actually be willing that policemen search his room for contraband which is certain to be discovered." Higgins v. United States, 93 U.S.App.D.C. 340, 209 F.2d 819, 820 (1940); see United States v. Gregory, 204 F.Supp. 884, 885 (S.D.N.Y.1962).

The defendant on appeal argued: "that since it is incredible he would freely have consented to a search which he knew would disclose incriminating evidence, his words of consent should be considered an involuntary submission to authority and therefore insufficient to waive a constitutional right." (Id. at 158–59)

The Court, however, held: "Where, as here, no force or deception was either used or threatened, we see no reason why a court should disregard a suspect's expression of consent simply because efficient and lawful investigation and his own attempt to avoid apprehension had produced a situation where he could hardly avoid giving it." (Ibid.)

Accordingly, based on the testimony adduced there would be ample justification for a finding that the defendants consented to the detention "so that the matter could be cleared up." See United States ex rel. Alexander v. Fay, 237 F. Supp. 142 (S.D.N.Y.1965); cf., United States v. Katz, 238 F.Supp. 689 (S.D. N.Y.1965); Gunderson v. Struebing, 125 Wis. 173, 104 N.W. 149 (1905).

It would thus appear that the defendants' obvious purpose was to cooperate fully in the hopes that the railroad police would be unable to determine the owner of the goods or whether they had been stolen, and that therefore they would go free, although unable to keep the cartons. That they were wrong is obvious; however, that they can now, by way of hindsight, rectify an incorrect choice is unwarranted.

While the consent issue is an important one, I nonetheless reject it, and prefer to base my holding on the right to stop, question and detain. The reasons for the choice of this course, both with respect to the probable cause issue (note 24, supra), and the consent issue, will be evident from that which follows in the text.

A.D.2d 497, 261 N.Y.S.2d 651 (2d Dep't 1965) (Mem.); People v. Entrialgo, 19 App.Div.2d 509, 245 N.Y.S.2d 850 (2d Dep't 1963) (Mem.), aff'd, 14 N.Y.2d 733, 250 N.Y.S.2d 293, 199 N.E.2d 384 (1964) (Mem.).

To hold otherwise would be to emasculate the statute and make the power to stop and question a mere gesture.[26]

" * * * Should the suspect refuse to explain what he was doing in the neighborhood and the policeman apologized for questioning him and then went about his duties, leaving the suspect to continue his lurking, the citizen would consider that he was not receiving adequate protection." Wilson, Police Arrest Privileges in a Free Society: A Plea for Modernization, 51 J.Crim.L., C. & P. S. 395, 398 (1960).

In the case at bar, as a result of the stop and questioning, the suspicion of the police was heightened by reason of the false answers of the defendants. Based both on the factors supporting the initial stop and on this heightened cause for suspicion, can it be seriously argued that the railroad policemen should have taken the defendants at their word, patted them on their heads, and after asking their names and an explanation of their actions, sent them on their merry way, to dispose of the cartons, irrespective of the answers given to the questions propounded? See also, Friendly, The Bill of Rights as a Code of Criminal Procedure, 53 Calif.L.Rev. 929, 948–49 (1965).

"If one looks at the problem [of stopping, questioning and detaining] in * * * terms [of determining the rea-

26. In People v. Estrialgo, (note 21, supra) the defendant was stopped in the street carrying a valise and asked by the officer where he had gotten it. When he responded that he was helping a friend "up the block" move his belongings, he was taken in the police car "up the block" to find his friend. When these efforts proved to no avail he was taken to the police station and questioned, and admitted that the valise had been stolen. The lower court sustained the right to stop and question but held that there was no further right to detain, irrespective of the answers given, no matter how implausible, so long as the circumstances did not rise to the level of probable cause. The arrest was held to have taken place when the defendant was placed in the police car.

On appeal, the decision was reversed (19 A.D.2d 509, 245 N.Y.S.2d 850 (2d Dep't 1963) (Mem.), aff'd, 14 N.Y.2d 733, 250 N.Y.S.2d 293, 199 N.E.2d 384 (1964) (Mem.)), the Court holding that the point of arrest was an issue of fact and that the detention did not *ipso facto* constitute an arrest.

In United States v. Mitchell, 179 F. Supp. 636 (D.D.C.1959), the defendant was observed at 5:30 A.M. carrying a sack, and from it was dangling an electrical cord. The policeman asked the defendant for identification and where he was coming from, and the defendant stated his name and replied that he was coming from a party. The officer testified that "walking my beat all night long, I did not observe any party any-

where", and asked the defendant to accompany him to a police call box, one block away. When the defendant asked whether he was under arrest, the officer replied: "No, you are just being detained." The Court held that the mere stopping and questioning was not an arrest (though in the classical sense, supra, it was), but that when the defendant accompanied the officer to the call box, he was arrested.

Thus the state of the law in the District of Columbia is to the effect that "even temporary detention for questioning constitute[s] an arrest * * *. [However], [t]he rule is subject to the qualification that police interrogation without some aspects of detention will not constitute an arrest." Shadoan, Law & Tactics in Federal Criminal Cases, 64–65 (1964) and cases cited at notes 128 and 129; though, as is evident from the cases cited, under either circumstance it is arguable that the person being questioned was at least detained to the extent that he was not at the moment of questioning a free agent who could go on his way if he so desired and, under the classical definition of arrest, was thus "arrested."

Query—whether the defendants in Jefferson v. United States, 349 F.2d 714 (D.C.Cir.1965), were under any less restraint for the period of questioning than the defendants herein? And if they were their liberty of movement was restricted (for that period) and they accordingly were "arrested" at least as that term is defined in Henry v. United States, supra.

sonableness of the investigative technique undertaken by balancing the seriousness of the suspected crime and the degree of reasonable suspicion possessed by the police against the extent of the invasion of the personal rights of the suspect] it becomes rational to argue that in *Henry* [supra] the police did have sufficient grounds for suspicion to justify the relatively minor interference with the personal liberty and property rights of Henry and Pierotti, which was involved in stopping their car, questioning them and looking through the open car door. In fact, did not the police act in a way which properly balanced the policies of the Fourth Amendment against the practical consequences to the suspected individuals? Based on one degree of suspicion, the police stopped the car and asked questions and looked through the window. Then, having a substantially higher degree of suspicion, they took Henry and Pierotti and the cartons to the office for the purpose of determining whether the cartons were in fact stolen property. Only after discovering that they were stolen did they take the final step of making a formal arrest and thus initiating the criminal prosecution with its severe consequences to the individuals charged. * * *

Similar questions can be asked concerning *Rios* [supra]. How much suspicion should be required before an officer can approach a stopped car (or a pedestrian) to make inquiries concerning the possible commission of a crime? At the point at which Rios dropped the heroin to the floor of the cab, whether or not there had been a momentary restraint on continued progress of the taxi or whether Rios or the policeman first opened the car door, was there sufficient suspicion to make the policeman's conduct 'reasonable' within the Fourth Amendment? Here the case seems closer than *Henry*. The basis for police suspicion was markedly less but so, too, was the extent of police invasion of Rios' personal and property rights. But whichever way the issue is resolved, should it be in the narrowly technical terms of false im-

prisonment? Where should the focus be? On such questions as whether the light turned from red to green before Rios dropped the heroin? Or on the broader questions of the reasonableness of the police action under all the circumstances?" Barrett, supra, 1960 Supreme Court Review at 64–65.

Thus, the decisions having the more serious consequences on the individual must be supported (as here) by a greater quantum of proof. What is thus envisioned is a step profile, to wit, that the probability of guilt required to subject a person to official action is directly correlated to the degree of interference with individual freedom contemplated by the action. LaFave, Detention for Investigation By the Police: An Analysis of Current Practices, 1962 Wash.U.L.Q. 331, 358–60. Indeed, the Uniform Arrest Act contemplates only a stop and question based on reasonable suspicion but permits stationhouse detention when the added element of unsatisfactory explanation of actions is present.

That the right to stop, question and detain is vital to the detection of crime in our modern urban communities cannot be doubted. See United States v. Bonanno, supra; LaFave, supra; Leagre, supra; Warner, The Uniform Arrest Act, 28 Va.L.Rev. 315, 320 (1942); Wilson, supra; but see Foote, supra. Nor can it be doubted that it is a practice engaged in by most if not all metropolitan police forces. See Remington, The Law Relating to "On the Street" Detention, Questioning & Frisking of Suspected Persons & Police Arrest Privileges in General, 51 J.Crim.L., C. & P.S. 386, 389 n. 22 (1960); LaFave, supra, 1962 Wash.U.L.Q. at 335–38.

However, of equal importance is the fact that the right to detain for investigation persons brought within the scope of legitimate police inquiry is a right firmly recognized in this circuit. United States v. Middleton, 344 F.2d 78, 83 (2d Cir. 1965); United States v. Vita, 294 F.2d 524, 530, 531 (2d Cir. 1961),

cert. denied, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788 (1962); United States v. Bonanno, 180 F.Supp. 71, 77–83 (S.D. N.Y.1960); United States ex rel. Corbo v. LaVallee, 270 F.2d 513, 518 (2d Cir. 1959), cert. denied, 361 U.S. 950, 80 S. Ct. 403, 4 L.Ed.2d 382 (1960); see also Collins v. Beto, 348 F.2d 823, 832, 836 (5th Cir. 1965) (concurring opinion per Friendly, J.) and authorities cited therein.

Thus, for example in United States v. Vita, supra, the Court upheld the right to detain a person against his will for a reasonable period where the purposes are solely investigatory and further held that this detention was not *ipso facto* an arrest, nor did it violate any of the defendant's rights.

" * * * The right to question has its roots in early English practice and was approved by the common law commentators and the courts. * * * In several states the authority of police officers to detain suspects for a reasonable time for questioning is granted by statute. * * * In others, the right is recognized by court decisions. * * * The line between detention and arrest is admittedly a thin one * * * but it is necessary if there is to be any effective enforcement of the criminal law. [294 F.2d at 530.]

* * * * * *

If the purpose is investigatory, and not simply to keep the accused in custody until he confesses, if the police have good reason to believe that the suspect must be questioned further in order to determine whether he or any other person ought to be arrested, detention for a reasonable period of time is permissible * * *." (Id. at 533).

The right to detain for a reasonable period was recently affirmed in United States v. Middleton, 344 F.2d 78 (2d Cir. 1965). While there is a dispute between the majority and Judge Moore's opinion as to the precise time that the arrest was effected, both opinions upheld the right to detain for investigative purposes.

"The precise scope of our decision today is, of course, necessarily limited by the particular facts of this case. We continue to believe, for example, that the Mallory exclusionary rule applies not to all statements taken during any delay in arraignment but only where the delay is unnecessary and unreasonable. United States v. Vita, supra; United States v. Ladson, [2 Cir., 294 F.2d 535], supra. Nor do we question the power of the police, under proper circumstances and while investigating a crime, 'to detain suspects for reasonable periods of time in order to question them, check their stories, and to run down leads which either confirm or contradict those stories.' United States ex rel. Corbo v. LaVallee, 270 F.2d 513, 518 (2 Cir. 1959) cert. denied sub nom. LaVallee v. Corbo, 361 U.S. 950, 80 S.Ct. 403, 4 L.Ed.2d 382 (1960). This long-recognized prerogative is vital not only to crime prevention and detection, but also 'protects those who are readily able to exculpate themselves from being arrested and having formal charges made against them before their explanations are considered.' United States v. Vita, 294 F.2d at 530. See also United States v. Bonanno, 180 F.Supp. 71 (S.D.N.Y.1960).

We simply hold that where the detention is unreasonable in length and its purpose is not investigatory, but to keep the accused in custody for an indefinite period until he confesses, statements taken may not be received in evidence at a later trial, particularly where grounds for an arrest or a warrant of arrest existed for some time before the accused confessed. Cf. United States v. Vita, 294 F.2d at 533." (Id. 344 F.2d at 83.)

The test stated in *Vita* was "whether the period of questioning was reasonable under the circumstances, and whether there was a point at which detention was tantamount to arrest * * *." (Id. 294 F.2d at 531.) When the investigation shifts to the accusatory stage, the

point alluded to is apparently reached under *Middleton*.

In an analogous situation, one commentator has stated thusly:

"Thus both states [Wisconsin and Michigan] recognize a right of detention following a valid arrest where it is necessary to obtain additional evidence sufficient for charging. As to the length of detention, no set time period applies to every case; a detention does not automatically become unreasonable because of the passage of two hours, ten hours, twenty-four hours, or some other span of time. The investigation must be carried on with 'due diligence and dispatch' and if the police have made no progress after a time they may be obligated to release the suspect. The nature of the crime is a factor, so that offenses usually requiring detailed investigation allow longer detention." LaFave, supra, 1962 Wash.U.L.Q. at 353. Indeed, in *Vita* the defendants were "detained" for some six hours and it was held to be reasonable whereas in *Middleton* one can infer that the detention past the half-hour mark was unreasonable but in any event the detention was unreasonable when it exceeded the two-hour mark.

Applying the test above set out to the facts found herein, we are presented with an almost classical picture of detention purely for the purposes of investigation, an investigation which I might add was conducted with due dispatch and diligence.

 The events following the arrival of the defendants at the railroad office clearly reflect the reasonableness of the detention at the office from 7:30 P.M. until 9:45, when Agent Conlon arrived. It is apparent from Lt. Matwijeczko's testimony that the period between 7:30 P.M. and approximately 9:00 P.M. was utilized by him in attempting to locate the owner of the two cartons and verify the interstate character of the shipment; and the inference is fairly strong that he

was also endeavoring to determine whether defendants' actions involved railroad property, a factor of considerable importance in view of his position, duties and statutory authority for an arrest as a railroad policeman. To these ends, he first endeavored to check defendants' story about finding the cartons at 30th Street and 11th Avenue; and upon returning to that corner he found nothing. Then he checked several businesses and yards in the immediate vicinity. Pursuant to this investigation he soon discovered at 29th Street and 11th Avenue, just one block from where defendants were first seen, a trailer, on the premises of Standard Hauling, which was parked in a fashion to permit entry and which contained other cartons identical in size, shape and markings to those carried by defendants. He immediately was in touch with the owner of Standard Hauling; and by approximately 9:00 P.M. the cartons had been positively identified by the owner, Mr. Wasserman, and their interstate character had been established by a bill of lading containing numbers identical to those appearing on the outside of the two cartons. Having established without doubt the interstate character of the shipment, the delay between 9:00 P.M. and 9:45 P.M. was due entirely to waiting for the arrival of the proper authorities, to wit, Agent Conlon of F.B.I. Under these circumstances, it is evident that the railroad policemen's relatively brief investigation was conducted with dispatch and was proper and reasonable. See United States v. Vita, supra, 294 F.2d at 531; United States v. Bonanno, supra, 180 F.Supp. at 76, 81. Thus defendants were properly detained.

In addition, what questioning there was, was conducted in a non-coercive manner,[**] and in fact the only testimony covering the period indicates that there was little questioning. During the detention period the conversation between the police and the defendants covered

---

[**] I do not consider Lt. Matwijeczko's statement "let's cut out the baloney" as being in any way coercive, viewed in the context in which it was made and the totality of circumstances.

other subjects as well, and the defendants were given coffee and sandwiches.

To be contrasted with this fact pattern is the situation in *Middleton, supra,* where it was held that "the Government has failed to show the need for pursuing a continuing process of essential investigation, and, even assuming it did, there was no showing that its officers were acting with the necessary expedition. Rather, the record permits only one conclusion: the procedures followed were merely excuses for delay during which a confession might be, and was, extracted." 344 F.2d at 82–83.

Accordingly, there was no point prior to the arrival of Agent Conlon when sufficient information had been uncovered

to charge the defendants and thereby transform what had been a reasonable period of detention for investigation into an unreasonable period of interrogation after arrest when the accusatory stage had been reached. Thus, in the case at bar the defendants were "arrested" in the legal and everyday definition of the word when so informed by Agent Conlon, and no activity prior to that point in any way violated their rights.[27]

I should like to make one final point with respect to the entire subject of police action in stopping, questioning and detaining under circumstances alluded to above.

The entire development of the law of search and seizure has been to ac-

---

27. Moreover, even assuming that the defendants were improperly arrested on the street (which I have held is not the case), I seriously question what fruit there is of the poisonous tree. (Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

"We are not, however, here concerned with detention or arrest per se, whether authorized by statute or by decisional law. We are concerned with principles of search and seizure. While much in the way of dicta has been said concerning the Fourth Amendment's protection against seizure of the person, i. e., unlawful arrest per se * * * no court, state or federal, has ever considered or held that an illegal arrest per se violates the Fourth Amendment or due process, as well as does an illegal search. * * *

 * * * * *

We must not lose sight of the fact that we are here however only concerned with 'detention v. arrest' as it affects the law of search and seizure, i. e., the admissibility of the 'product' of the search, to convict." People v. Entrialgo, 37 Misc.2d 264, 233 N.Y.S. 2d 558, 576 (S.Ct.), rev'd on other grounds, 19 A.D.2d 509, 245 N.Y.S.2d 850 (2d Dep't 1963), aff'd, 14 N.Y.2d 733, 250 N.Y.S.2d 293, 199 N.E.2d 384 (1964) (Mem.); see Pigg v. United States, 337 F.2d 302, 306, 309 (8th Cir. 1964) (dissenting opinion per Ridge, J.), and authorities cited therein.

In the case at bar, no fruit was borne from the poisonous tree. No incriminating statements were elicited from the

defendants during the detention nor were they searched, nor was anything seized (they at all times handled the cartons). And while Lt. Matwijeczko's act of ripping open the carton (without any objection from the defendants) was perhaps ill-advised, under the circumstances it was not fatal since nothing was accomplished as a result of the act, no bill of lading was revealed or used, and no other information secured. The information used to track down the origin of the cartons (the verbal information was secured on the street at the first encounter where the defendants concede there was no arrest) namely, the markings on the outside of the cartons, was in plain and open view, and was observed and noted by the officers on the street. Surely observing that which is in open view and not secured by reason of a trespass in no way constituted an illegal search. See Ker v. State of California, 374 U.S. 23, 43, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); Ellison v. United States, 93 U.S.App.D.C. 1, 206 F.2d 476, 478 n. 3 (1953) and cases cited therein; United States v. Barone, 330 F.2d 543 (2d Cir.), cert. denied, 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053 (1964); People v. Cotton, 22 A.D.2d 692, 253 N.Y.S.2d 279 (2d Dep't 1964) (Mem.).

The only result of the detention was keeping the defendants accessible and the cartons, which did not belong to them, in their possession, so that an arrest, if that consequence eventuated, could be effected. Accordingly, even assuming the source to be polluted, the source fawned no offspring, and since nothing was hatched there is nothing to suppress.

cord to the guilty a measure of protection (which no doubt enures to the benefit of society as well) from police action which, though successful, was nonetheless illegal and no one can quarrel with the validity of protecting these rights, although in the process guilty men go free. "The basis for excluding real evidence obtained by an unconstitutional search is not at all that the use of the evidence may result in unreliable factfinding. The evidence is likely to be the most reliable that could possibly be obtained; exclusion rather than admission creates the danger of a verdict erroneous on the true facts. The sole reason for exclusion is that experience has demonstrated this to be the only effective method for deterring the police from violating the Constitution. A defendant is able to prevent the reception of evidence proving his guilt not primarily to vindicate his right of privacy since the benefit received is wholly disproportionate to the wrong suffered, but so that citizens generally in the words of the amendment may be 'secure in their persons, houses, papers and effects against unreasonable searches and seizures * * *.'" Friendly, supra, 53 Calif.L. Rev. at 951.

 In considering Fourth Amendment rights and protections, it must be borne in mind that the valuable protections to innocent persons must be accorded recognition as well, one of those protections being that a citizen may not be arrested without probable cause.

No one can doubt the ignominious consequences resulting from an arrest—the indignity of being taken into custody, fingerprinted, photographed and detained until the time for arraignment. If the person so arrested is unable to secure bail, he may be held for weeks or even months awaiting trial. Even if he is released within a few hours he will have acquired an arrest record which may haunt him for the remainder of his life.

" * * * [I]f the general public interest in adequate law enforcement is to be served, it is clear that police must be given reasonably wide powers of investigation. Furthermore, if the goal is to protect individuals from the serious invasion of personal rights which results from formal arrests and charges of crime in the absence of clear showing or probable cause to believe that they have committed a crime, reasonable latitude must be given for investigative techniques * * *." Barrett, supra, 1960 Supreme Court Review at 58, and see cases cited at note 50.

Thus, a period of detention to permit the police to investigate is an opportunity to clear oneself before the onerous consequences of arrest are imposed. It is in the area of detention for investigation that the conflict between the interest of the innocent person to exculpate himself and the interest of the guilty not to supply further information comes into sharp focus. Therefore, aside from the necessity of this practice to apprehend the guilty and to prevent those inclined from committing crime, there is the added factor of protection of the innocent from the stigma of arrest, which should not be overlooked.

To the innocent person seeking to avoid the consequences of arrest, a reasonable period of detention during which he can explain his actions and vindicate himself is a welcome right and but a minor inconvenience as compared to arrest.[28] (See

---

28. The practical differences between arrest and detention cannot be minimized, either.

Aside from the usually comparatively limited period of detention (though there are exceptions—see LaFave, Arrest, 346 n. 15 (1965)—) the detention, if it does not ripen into an arrest, will not be recorded as an arrest, and therefore the suspect will have no arrest record. While

Section 944 of the New York Code of Criminal Procedure (Supp.1965) provides for the return of all records of arrested persons if the person is acquitted or not brought to trial, persons previously convicted of a crime or of vagrancy or disorderly conduct are not thus protected. In addition, between the time of recordation and the return of the record there is no assurance that some of the arrest

Wilson, supra, 51 J.Crim.L., C. & P.S. at 400; Barrett, Police Practices & the Law—From Arrest to Release or Charge, 50 Calif.L.Rev. 11, 45–46 (1962); see also, United States ex rel. Stovall v. Denno, 355 F.2d 731 (2d Cir. 1/31/66); Kamisar, Criminal Justice In Our Time, Magna Carta Essays, 9–10 (University of Va. Press 1965) (citing Barrett, supra.)) To the guilty person, however, the period of detention for investigation affords the police an opportunity to link him more closely to the crime and permits the police to acquire sufficient evidence to meet the probable cause standard. His desire is to either go free or to force the police to commit themselves and arrest him before there is sufficient probable cause, and thereby void all the fruit of the poisonous tree.

The example cited by Judge Kaufman in United States v. Bonanno, supra (180 F.Supp. at 82–83) of the accused sex offender is sufficient evidence of the necessity of affording an opportunity to "suspects" to tell their story before being formally arrested and charged.

■■■ The pursuit of justice is not a game with the cards stacked in one corner, but it is rather an attempt to convict those rightfully accused and, equally as important, to acquit those wrongfully accused, and, it is submitted, to permit those wrongfully "suspected" to exculpate themselves prior to formal apprehension.

"The interplay between the exclusionary rule and the rule that searches must be justified as incidental to valid arrests presents the danger of two undesirable side effects. Pressure may be placed on the police to make arrests too early in the investigative process. Pressure may be placed on the courts to water down the

standards for probable cause to make formal arrests in order to avoid freeing obviously guilty defendants because of relatively minor invasions of their privacy.

The first point is illustrated, of course, by the *Henry* case, discussed above. If the courts equate the invasion of personal privacy involved in a formal arrest and charge with that involved in stopping a car to question the occupants, why should not the police? In cases like *Henry* and *Rios* the Court says to police that in order to justify a search they must first make an arrest. Before they stop a car under suspicious circumstances of the type involved in *Henry* to make simple inquiries concerning the contents of the cartons they must first have probable cause for, and in fact make, an arrest. In *Mallory* [Mallory v. United States, 354 U.S. 449 [77 S.Ct. 1356, 1 L. Ed.2d 1479] (1957)] the Court tells the officers that as soon as they make the arrest their duty is to bring the arrested person as rapidly as possible before a magistrate where charges must be filed. But at this point does not common sense fly out the window? If the search is fruitless (and it is in the nature of 'probable cause' that it is something less than a certainty), should the innocent person have added to the relatively mild invasion of his privacy so far involved the more serious consequences of being taken into custody, given a formal arrest record, and forced to go before a magistrate to have charges against him dismissed? One may suspect that police do not in fact act in accordance with this view of their duties. But it may well be true that they are driven by the rules in the search and seizure cases to make arrests earlier in the investigative process than they might otherwise simply to insure

information other than that which must be returned has not been forwarded to other law enforcement agencies.

In addition, the suspect would be fully justified in answering in the negative a question on an employment form asking if he had ever been arrested. (But see Federal Employment Standard Form No. 57 (Revised March 1961), which in-

quires whether the applicant has ever been held for investigation or questioning.)

Of the greatest importance is the fact that brief detention most often is unnoticed and does not come to light, and therefore there is little or no stigma as compared to that present when there is an arrest.

that evidence secured will ultimately be usable at the trial." Barrett, supra, 1960 Supreme Court Review at 65–66.[29]

If the police seek to justify their actions as an arrest based on probable cause, the dangers are great. For if the concept of probable cause is expanded to cover these necessary though ambiguous cases, the effect will be to widen the power of the police to visit upon persons the consequences of arrest when such should not be done. Thus the constitutional standard of probable cause prior to an arrest, and the protection it affords, will be diluted to the point that situations warranting a stop, question and detain will be considered an arrest though such should not be the case. (See, e. g., State v. Harris, 265 Minn. 260, 121 N.W.2d 327, cert. denied, 375 U.S. 867, 84 S.Ct. 141, 11 L.Ed.2d 94 (1963), approved, Harris v. Tahash, 353 F.2d 119 (8th Cir. 1965); Bell v. United States, 102 U.S.App.D.C. 383, 254 F.2d 82, cert. denied, 358 U.S. 885, 79 S.Ct. 126, 3 L. Ed.2d 113 (1958)).

As noted herein,[24 and 25] the Court may well have been justified in finding probable cause or consent to the detention. However, even the slightest expansion of the concept of probable cause or the slightest dilution of consent to cover necessary police action is unwarranted and dangerous because of the rights that these two concepts protect.

If we must always justify necessary and proper police action by seeking to fit it into the above two concepts, we are engaging in a self-defeating process. I think the rights of our citizens would better be protected by an explicit decision recognizing the right to stop, question and detain, and then setting down the predicates for its invocation and the procedural safeguards incident to its use. If this be done, then both the citizens and the police will be able to engage in a practice that not only is necessary but is engaged in even without explicit authority, but will now be subject to Court control. Of similar importance is the fact that police will not have to resort to other subterfuges of questionable validity in order to properly investigate and interrogate. See LaFave, supra, 1962 Wash. U.L.Q. 367–73; see also, Hutcherson v. United States, 345 F.2d 964, 971 (D.C. Cir. 1965) (Opinion per Bazelon, C. J.).

There is no doubt that formulating a workable standard will be difficult, but the difficulty of the task should not dissuade the Court from undertaking it.[30]

While practicalities should not dictate what decision a court of law should reach, they surely should play some part in a decision which affects in a very practical sense both the citizen and law enforcement authorities.

As a practical matter, the activity described herein is a necessary police technique and one universally engaged in. Rather than shut one's eyes to the obvious the Court considers it more expeditious to recognize the right and set down the circumstances under which it should be utilized.

---

**29.** In United States v. Bonanno, supra, 180 F.Supp. at 82, Judge Kaufman stated:

"If the police are told that they may not question a person until he has been formally arrested and arraigned, they will carry out that precept to the letter, especially if to do otherwise would be likely to result in an escape from punishment by guilty men. Instead of giving a person an opportunity to exculpate himself from any suspicion of wrongdoing, they will arrest him first and ask questions afterwards."

Indeed, it has been noted that the courts have been shifting the precise time of arrest so as to validate the specific police action under scrutiny. See Note 50 Calif.L.Rev. 348 (1962).

**30.** Since, in the case at bar, the total period of detention was short in addition to being reasonable, no incriminating statements were elicited and the police activities were above-board, the Court need not consider the issues of abuse of this process or of the rights to be accorded to a suspect prior to his making a statement, or the procedures available to gain release. These issues must await a case more properly presenting them.

See notes 24 & 25 on pages 786 & 787.

The fact that some will abuse the power is similarly no reason to withdraw it since the courts are no less powerful to deal with abuse in this area than they are in other areas. See, e. g., Porter v. Wilson, 245 F.Supp. 396 (N.D.Calif.1965).

In sum, I find the action of the railroad policemen herein to have been proper and necessary in the circumstances presented and in no way violative of any rights of these defendants, and, accordingly, the motion to suppress is in all respects denied.[31]

So ordered.

31. Note must be made of the authoritative and exhaustive brief submitted by the Government in opposition to the motion to suppress. It was of great assistance and is appreciated by the Court.