Richard G. Denzer, J.
Charged with criminal possession of stolen property in the first degree, consisting of several thousand dollars worth of stolen typewriters, the defendants move to suppress those machines as evidence in the case on the ground that they were obtained by means of an unlawful search and seizure. After a hearing upon the motion at which testimony was given by two police officers and the defendant White, I find the pertinent facts to be as follows.
At about 11:15 a.m. on Sunday, August 8, 1975, two New *709 York City police officers, Albert Horz and Gary Stryker, were on routine motor patrol in the vicinity of Houston and Chrystie Streets in lower Manhattan. Horz was driving south on Chrystie Street when they passed a Hertz rental truck parked at the curb, facing south. In passing, they saw, in the cargo area of the truck, a man, the defendant White, and a number of cartons bearing markings of "S.C.M.” and "I.B.M.”, which White was rearranging.
The officers proceeded one block down Chrystie Street until halted by a red light. As they were waiting there, another man, the defendant Pitts, walked over to their car from the vicinity of the rental truck and, explaining that he had cut his finger on the cartons in the truck, asked them for a bandaid. Having none, the officers gave him a paper towel. In response to Horz’s inquiries concerning the ownership and destination of the truck, Pitts stated that it was his and that he was bound for some place on Cherry Street; and he asked for directions to that street, which Horz supplied.
Proceeding another block south on Chrystie Street, the officers, their interest aroused, drove back to the truck to investigate, and parked behind it. Their curiosity stemmed from the facts that, in their long experience in the precinct, they had never seen or heard of business machines being delivered anywhere in this area on a Sunday; that the defendants were dressed in ordinary business suits rather than laboring clothes; and that the truck was a rented one.
Getting out of the patrol car, the officers conversed with Pitts on the street at the rear of the truck. White, who continued to work inside the cargo area, was perspiring profusely — a fact which indicated to the officers that the cartons were not empty.
Pitts, again asked whether he was the owner of the truck, replied that he was not but that he had all the appropriate papers. A rental agreement bearing the defendant White’s name was produced, and White, emerging from the truck, produced his driver’s license, both documents being in order.
Further asked where in particular on Cherry Street he was bound, Pitts declared that he had no address but would recognize the place by its landmarks. At about this point, Officer Horz, noticing that a shipping label on one of the cartons in the truck bore the name "Cornell University,” asked Pitts from what point he had driven. Pitts designated Cornell University, of which he was a graduate, as his point of *710 departure and asserted that he had been sent by a Cornell newspaper to deliver the cartons to Cherry Street. Asked if he had a bill of lading, he produced a handwritten "inventory” listing various numbers of different styles of typewriters and their value, the total amount being more than $13,000. When Horz remarked that this was not a proper bill of lading, Pitts said that it was all that he had received but that he had the telephone number of people who could straighten the whole thing out. Upon Horz’ assertion that they would have to go to the station house briefly for the purpose of having the ownership of the property verified, Pitts assured that this would be "no problem.”
Officer Stryker then said that he would drive the truck to the police station, and he was given the keys. He opened the driver’s door of the cab and, as he was entering, he moved an object, wrapped in canvas, that was in his way on the floor. Feeling a gun stock through the covering, he unwrapped the object and found a loaded rifle and a bandolier of ammunition. Stryker then left the cab and informed Officer Horz of his discovery. Horz immediately ordered the defendants to put their hands on the patrol car, patted them down and arrested them for possession of a loaded rifle inside the city limits, a violation of the New York City Administrative Code. The defendant Pitts explained that they were delivering the rifle to someone on First Street. Horz replied that the rifle was not a major problem and that they need not worry so long as the ownership of the property was verified.
With the defendants riding with Horz and Stryker in the patrol car, and the truck being driven by another police officer summoned to the scene, everyone and everything soon arrived at the Fifth Precinct station house. There, Officer Horz telephoned Ithaca, New York, and spoke to the head of security for Cornell University. The latter informed him that 78 typewriters had been stolen from Cornell the previous night and gave Horz the serial numbers of a few of them. A check of the cartons and merchandise in the truck by Officer Stryker, who then entered the cargo area for the first time, quickly confirmed that this was the property stolen from Cornell. The defendants were then placed under arrest for criminal possession of stolen property, and, presumably, the truck and its cargo were thereafter driven off and impounded.
Seemingly urging an unreasonable stopping and seizure on Chrystie Street of the truck and its cargo, and improper *711 detention or restraint of the defendants themselves during that incident, the latter contend that the ultimate arrests and search of the truck were thereby tainted with illegality, thus precluding reception of the acquired contraband as evidence in this prosecution.
These contentions appear to proceed upon the premises that most police halting and interrogation concerning possible criminal conduct amounts to "seizure” of the person interrogated; that virtually every escorting or taking of a motor vehicle to a station house constitutes a "seizure” of the vehicle and its contents; and that activity of the foregoing nature is almost invariably violative of the Fourteenth Amendment to the Federal Constitution unless the police have "reasonable” or "probable” cause to believe that criminal conduct has recently occurred or is afoot. It is well settled, however, that even in the absence of circumstances justifying an arrest or a seizure of property, the police frequently are authorized and, indeed, obligated to engage in reasonable investigatory activity, such as stopping persons and vehicles, street interrogation, directing people to exit automobiles, and the like. In short, such authority arises not only upon reasonable belief that criminal behavior has occurred or is imminent but also where the circumstances merely raise a reasonable suspicion of criminality or are of such nature as to impel a person fairly sophisticated in law enforcement work to explore for possible criminal activity. (People v Rosemond, 26 NY2d 101, 104-105; People v Rivera, 14 NY2d 441, 444-445, cert den 379 US 978; People v Morales, 22 NY2d 55; People v Entrialgo, 19 AD2d 509, affd 14 NY2d 733; People v Dread, 49 AD2d 401; Rios v United States, 364 US 253; Terry v Ohio, 392 US 1; United States v Bonanno, 180 F Supp 71; United States v Thomas, 250 F Supp 771, affd 396 F2d 310.) One manifestation of this general principle is, of course, the so-called stop-and-frisk doctrine — inherent in the common law and codified in New York (CPL 140.50; Terry v Ohio, supra) — authorizing police stopping and interrogation upon reasonable "suspicion”, as distinguished from "belief,” of the occurrence or imminence of criminal behavior.
Whether the requisite mental state required for the indicated kind of police action be labeled "reasonable suspicion” or some other term importing a thought process weaker than "reasonable belief’ is purely a matter of semantics. The key word is not the noun employed but the adjective "reasonable.” *712 Illustrations of the kinds of situations which form a "reasonable” basis for investigation, though not for arrest or property seizure, are plentiful. (See, e.g., People v Rosemond, supra; United States v Thomas, supra; United States v Bonanno, supra.) On the other hand, stopping, interrogation and temporary personal restraint is unreasonable when predicated upon, for example, nebulous circumstances implying, at most, some trivial transgression of law. (People v Cantor, 36 NY2d 106.) The reasonableness of the action in any given instance rests upon the facts and circumstances of the particular case viewed in the light of both professional and community opinion of what constitutes efficient and proper law enforcement activity. (United States v Thomas, 250 F Supp 771, 784-785, supra.) Frequently, moreover, routine and perfectly proper police accosting and questioning, prompted by curiosity derived from some unusual circumstance, converts mere interest into suspicion and thereby acts as a catalyst for further and more thorough investigation (People v Rosemond, supra, p 105).
Such was the situation at hand. The officers’ interest was first aroused by what appeared to be a substantial shipment of business machines in a parked truck, supposedly being delivered on a Sunday morning to some unnamed concern in an area where it would be highly unlikely that such an establishment would be open at the time; and by the further facts that the truck was a rented vehicle manned by two persons in regular business attire rather than working clothes, one of whom was laboriously rearranging the cargo. That an approach and a few questions at this point constituted reasonable police activity seems beyond cavil. This produced the further information that the defendants had driven the truck from Cornell University; that the cargo consisted of about $13,000 worth of typewriters; that the defendants had no bill of lading for the shipment, but only a handwritten piece of paper designated an "inventory”; and that they did not even know the address of their asserted destination "on Cherry Street.”
By this time, the snow-balling circumstances had depicted a state of affairs which any competent police officer would deem, at the very least, "suspicious” and demanding of further investigation with respect to the source and ownership of the machines. Since the requisite verification could hardly be done at the scene, pursuit of the matter back at the police station *713 was the only logical procedure available. This project was undertaken with the apparent acquiescence of the defendants, who declared that verification of the property would be "no problem,” and who turned over the truck keys to Officer Stryker without any indication of reluctance or resentment.
It is to be observed that the discovery of the rifle in the cab of the truck at this juncture and the arrest of the defendants for the minor offense involved therein is of no real significance here. The only important matter, as the officers explicitly advised the defendants, was the ownership of the typewriters. The possible offense under investigation was not possession of a rifle in violation of a New York City ordinance but criminal possession of thousands of dollars worth of stolen property.
Thus, whether or not the arrest upon the rifle charge would in itself have justified the taking of the truck to the police station is academic. The decision to proceed to the station house had been made, and was in the process of execution, before discovery of the rifle. That decision was not predicated upon an arrest for any offense, but upon valid investigatory purposes.
Nor did the driving of the truck to the police station constitute a "seizure,” unreasonable or otherwise, of the vehicle or its cargo. In the context of events, the truck could hardly be left on Chrystie Street but, as a practical matter, had to be brought to the police station. There was no police intention at this point of impounding or in any way "seizing” it or its contents from the defendants; and, had the ownership matter been readily straightened out, as seemed probable from the defendants’ assurances, they would have been quickly on their way with their property. When, however, the telephone call from the police station to Cornell University and the checking of the cartons in the truck soon exposed the stolen character of the machines, the legal aspects of the matter changed drastically. With far more than reasonable cause to believe that the defendants were knowingly in possession of stolen property, the police had passed the investigatory stage and arrests were manifestly authorized.
Contrary to the defendant’s contention, that conclusion is not affected by the fact that, just before the arrests, Officer Stryker had entered the truck to check the machines and serial numbers obtained by telephone from Cornell. Assuming this to have constituted a warrantless "search,” as the defendants urge, it was not invalidated by the circumstance that it *714 was made shortly before rather than after the arrests. At this point, the police already had more than reasonable or probable cause (from Cornell) to believe the typewriters stolen and could readily have made the arrests without physically checking the merchandise in the vehicle. That being so, the precise order of events (search and arrest) became immaterial, for "Once there is probable cause for an arrest without a warrant it is immaterial that a search” without a warrant "precedes the arrest” (Husty v United States, 282 US 694; Busby v United States, 296 F2d 328, 332).
It is apparent from the foregoing that there was no search or seizure of the truck, of its cargo or of the defendants back on Chrystie Street, and no detention or arrest at that point. Nevertheless, even could the Chrystie Street events somehow be regarded as constituting a search and seizure of property upon which the subsequent arrests were founded, the defendant’s position would not be improved.
It is, of course, a general proposition that a warrantless search of premises not incidental to a lawful arrest ordinarily is impermissible absent unusual circumstances, even though made upon reasonable belief that contraband may be found; and that evidence so seized is not admissible in a criminal prosecution against the possessor (Chapman v United States, 365 US 610). The same is not true, however, with respect to motor vehicles. Owing to their mobility, a search of a motor vehicle without a warrant based upon a reasonable possibility of contraband discovery is justified even though at the time reasonable cause to arrest for a crime does not exist (Carroll v United States, 267 US 132; Brinegar v United States, 338 US 160; Chambers v Maroney, 399 US 42; People v Brown, 28 NY2d 282; People v Maier, 47 AD2d 344).
Furthermore, while in a literal sense there must, as indicated, be reasonable belief that fruits or implements of crime will be found in the vehicle, the clear thrust of the leading case of Carroll v United States (supra), and decisions stemming therefrom is that a much more flexible definition of reasonable or "probable cause” must be employed in cases of vehicles than in cases of premises; that there is a substantial "difference in measure of protection against search, between a vehicle and a home” (People v Brown, supra, p 286); and that "the ease with which motor vehicles may be moved has resulted in liberalizing the rule governing searches” thereof (Ringel, Searches & Seizures, Arrests and Confessions, 1972, *715 § 298, p 391). Thus, in the Carroll and Brinegar cases, for example, the "probable cause” for the there approved halting and immediate searches of the motor vehicles involved consisted not of incriminating conduct by the defendants at the scene but largely of the government agents’ knowledge of their reputations, and of suspicion of illegal activities by them long prior to the stopping incidents.
Here, on the other hand, the stopping incident was predicated entirely upon the defendants’ behavior and the attendant circumstances at the scene. The police were confronted by two men in business attire acting in a confused manner with a parked rental truck ostensibly containing a substantial shipment of expensive business machines showing a "Cornell University” label and assertedly being delivered by them at a time and place which the nature of the area stamped most unusual. All this, in conjunction with the further facts that the defendants did not have a bill of lading and did not even know the address of their alleged destination, amply provided the officers with reasonable cause to believe that the vehicle might contain contraband. Accordingly, they were entitled to —although they did not do so — search the truck then and there; or, if that were impractical, to assume custody of it for search purposes but postpone the search until they could get it to a police station. (Chambers v Maroney, 399 US 42, supra.)
The overall impression of the officers’ conduct conveyed by the various occurrences of this case is one of thoroughgoing reasonableness throughout. Examination of decisions in highly analogous factual situations supports the conclusion that, regardless of technicalities concerning the time and place where the search, seizure or arrests in this case may be deemed to have been made or consummated, the merchandise in question was properly obtained for evidentiary purposes (see, e.g., People v De Vito, 77 Misc 2d 463; United States v Thomas, 250 F Supp 771, affd 396 F2d 310, supra).
The motion is denied.