UNITED STATES of America ex rel. Josh ALEXANDER, Relator-Petitioner,

v.

Edward M. FAY, as Warden, Green Haven Prison, Stormville, New York, Respondent.

United States District Court
S. D. New York.

Jan. 12, 1965.

Anthony F. Marra, New York City, for petitioner; Joshua N. Koplovitz, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., of New York, for respondent; John DeWitt Gregory, Asst. Atty. Gen., of counsel.

WYATT, District Judge,

This petitioner for a writ of habeas corpus, Josh Alexander, is in the custody of the penal authorities of New York serving at Green Haven Prison, Stormville, Dutchess County, a sentence of imprisonment of from five to ten years imposed on December 13, 1961 by the former Kings County Court (Sobel, J.) after petitioner had been found guilty of burglary in the third degree (Penal Law, McKinney's Consol. Laws, c. 40, § 404). The trial had been on October 23, 1961 and was without a jury.

The petition was filed in this Court on January 13, 1964. The petitioner was then acting for himself without counsel, but submitted as part of his petition a brief on his behalf in the State Court prepared by Leon B. Polsky, Esq., of the Legal Aid Society.

The principal point made in the petition was that petitioner had been arrested illegally (without probable cause) and that statements made by him thereafter, exculpatory and otherwise, were admitted at his trial in violation of his constitutional rights under Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) and more particularly Wong Sun v. United States, 371 U.S. 471, 484–487, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The petition was on the criminal motion calendar for February 3, 1964, on which day the late Judge Noonan was presiding. Decision was reserved

After consideration of the petition, Judge Noonan requested a copy of the minutes of the State Court trial.

On May 1, 1964, and before submission of the trial minutes, Judge Noonan died.

On May 4, 1964, the trial minutes and a memorandum of the Attorney General of New York were submitted to the Court.

The petition was restored to the criminal motion calendar for June 1, 1964, on which day I was presiding and reserved decision on the petition.

By order filed October 5, 1964, I directed that a hearing he held and assigned counsel of the Legal Aid Society to represent petitioner.

The hearing was held on November 2, 1964. Joshua N. Koplovitz, Esq., of the Legal Aid Society, represented petitioner (who was present at the hearing and testified). John DeWitt Gregory, Esq., Assistant Attorney General of New York, represented the respondent Warden.

The relevant facts appear to be as follows.

May 13, 1961 was a Saturday. At about 3:30 in the afternoon of that day, two police officers of the City of New York—Thomas Woods and John Sportack—in uniform were patrolling in an automobile. They were on "radio motor patrol" (SM 32; "SM" references are to pages of the stenographic minutes of the November 2, 1964 hearing) and were assigned to an area described as Section 4 of the 80th Precinct. This area is in Brooklyn and is bounded by Fulton and Bergen Streets and by Franklin and Vanderbilt Avenues.

The officers had been on duty since 8:00 in the morning. Before going out on duty, the practice is for the sergeant to brief the patrolmen, particularly as to what crimes had been committed in the precinct area, and where, during the prior 24 hour period.

Before going out on May 13, officers Woods and Sportack had been told by the sergeant that there had been a number of daylight burglaries in the precinct in which television sets, cameras, and other appliances had been stolen from apartments which were empty because the occupants were away at work. The sergeant told Woods and Sportack "to be on the alert for daytime burglaries" (SM 61).

At about 3:30 in the afternoon the two officers were driving north along Clinton Avenue toward the corner of Fulton Street. This is a residential section, predominantly negro, with a number of apartments. Near the corner of Clinton Avenue and Fulton Street, the officers saw two negro men (later identified as petitioner Alexander and his companion Lee O'Neill) carrying a television set across the sidewalk and placing it in an automobile parked alongside the curb.

The officers were suspicious and parked their car on Clinton Avenue about two car lengths ahead of the car in which the two men were placing the television set. Woods got out of the police car first and first arrived at the car into which the television set was being placed. Sportack came up shortly after. The set had just been "rested * * * on the back seat of the car" (SM 47). O'Neill was in the car, Alexander on the outside. Doubtless because Alexander was on the outside, Woods addressed his questions to Alexander. Woods asked: "Where did you get that television set?" (SM 48) Alexander answered: "This television belongs to a friend of mine; I'm taking it to have it repaired" (SM 36). Woods then asked: "Where does this friend live?" (SM 36) Alexander pointed to a house—503 Clinton Avenue—which was next to where the car (with the television set) was parked. Woods then said: "Let's go up and check" (SM 37) Alexander made no objection; he said nothing. Woods went first into 503 Clinton Avenue, Alexander followed, and Sportack brought up the rear. O'Neill was left alone in the car with the television set. According to Woods, Alexander "took" the two officers "to the third floor of the building" (SM 38). I understand from this that Alexander

either told the officers his friend lived on the third floor or led them there. On the third floor, Alexander "pointed to a door" (SM 38), to indicate the apartment of the friend whose television Alexander was taking to have repaired. Woods then knocked on the door to which Alexander had pointed. A man came to the door. Woods asked: "Did you give this man your television to be repaired?" (SM 51) The reply was: "I've never seen this man before in my life" (SM 51). The two officers and Alexander then went down the stairs. When they came to the second floor the officers observed that the door to an apartment on that floor had been "jimmied", that is, "the tips around the lock had been pried" (SM 40). They were thus able to enter that apartment through the door and they did enter with Alexander. There was no one at home; it was empty. They saw that the door to a closet in the apartment had also been forced open. After the third floor "friend" had destroyed Alexander's story and after the officers saw the forced doors of the empty second floor apartment, they concluded that Alexander and O'Neill had stolen the television from the empty second floor apartment. They went downstairs from the second floor with Alexander; as they went down Woods said to Sportack: "I think we have a burglary, watch him". They returned to the car and the officers put handcuffs on Alexander and O'Neill; they later took the prisoners to the police station.

The foregoing findings are based on the testimony of the police officers.

The testimony of Alexander confirms in many respects the testimony of Woods and Sportack. Differences between the testimony of the officers and that of Alexander will not be noted except with respect to the question whether there had been any restraint of Alexander before leaving the second floor "jimmied" apartment.

Alexander admits that he told officer Woods when first questioned that the television belonged to a "fellow in the house" (SM 13); that they were going to take it to be repaired, and that he (Alexander) pointed out 503 Clinton Avenue as the house in which the claimed owner of the television lived.

Alexander denies that he went willingly into 503 Clinton. On the contrary, he testified on direct examination that he refused to go into the house, at which point Woods "pulls out a gun and he says, 'Let's go'" (SM 13) and took hold of Alexander's arm; that Woods "told" (SM 14) Alexander to go into 503 Clinton; that after a conversation with an occupant of a third floor apartment Woods "grabbed me by my belt" (SM 14); that he (Alexander) felt restrained of his liberty from the first questioning by Woods because Woods took his driver's license to examine it; and that when Woods grabbed him by the arm and said "Let's go upstairs", he (Alexander) thought he "was either under arrest or to be arrested if I refused to go" (SM 17).

On cross-examination, Alexander was in a number of matters inconsistent with his direct examination. For example, on cross he backed away from his direct testimony that Woods had pulled out a gun:

"Q And he didn't take out his gun or anything of that sort? A No, but he did put his hand on his gun before he put his hand on my arm.

"Q Did he open his coat and put his hand on you at this time? A No, he didn't open his coat. His coat had a slit in it, and he just threw it back and put his hand on the gun." (SM 24)

Both officers denied that either had at any time touched the person of Alexander. Officer Woods denied that he put his hand on his gun.

On cross-examination by counsel for Alexander, officer Woods testified as follows (SM 59):

"Q Well, let me ask you this, Officer: If Alexander had said, 'I don't want to go with you,' and he

started to walk away, what would you have done? A Let him go.

"Q You would have let him go? A Yes."

Officer Woods elsewhere testified that the reason they left O'Neill downstairs in the car alone was that they "didn't know that man had committed any crime at that particular time" (SM 57).

On cross-examination by counsel for Alexander, officer Sportack testified as follows (SM 72):

"Q In your opinion as a police officer, Alexander was not detained when he accompanied you and Officer Woods to the third floor? A Definitely not.

"Q In other words, if he had wanted to walk away, you wouldn't have said anything, you wouldn't have tried to hold him? A Definitely not.

"Q In other words, he went up there—A of his own free will.

"Q Of his own free will? A Yes.

"Q And you were not holding him? A No, sir."

On the issue whether any force or threat of force was used by the officers in connection with the visit to 503 Clinton Avenue, I must accept the testimony of the two officers as more credible, reasonable and logical than that of Alexander. Among other things, it would be totally inconsistent for the officers to leave (as they did) O'Neill alone and free to vanish while at the same time pulling a gun on Alexander, the other suspect, and grabbing him by the arm. O'Neill was implicated to the same extent as Alexander; the only difference was that Alexander, as the one outside the car, was first questioned by officer Woods.

After Alexander and O'Neill had been handcuffed, Sportack found a "prying iron" or "jimmy" (SM 73) on the floor of the back seat of the car into which the prisoners had put the television. The "jimmy" had paint on it. Sportack went back into 503 Clinton and found that the "jimmy" "measured exactly the wedge that was in the door, and the paint was the same color paint" (SM 73).

Thereafter O'Neill and Alexander were indicted for burglary in the third degree and for petit larceny. They were tried together before Judge Sobel in Kings County Court on October 23, 1961, each defendant having waived a jury. They were represented by separate counsel, apparently selected and retained by them.

Without objection by counsel for either defendant, officer Woods testified for the prosecution to the statements made by Alexander when first questioned and before going into 503 Clinton. In response to questions by the Court, Woods also testified that "at the scene", which was apparently referring to the handcuffing at the car after leaving 503 Clinton, Alexander "changed his story and said that he had met a friend, who was going to give him $7 for taking the television from the second floor apartment to a Ralph Avenue place" (trial minutes, page 21–22).

O'Neill testified at the trial, Alexander did not.

Judge Sobel convicted both defendants of burglary in the third degree and petit larceny. The conviction of Alexander was stated to be based on recent possession of stolen goods coupled with the false explanation to officer Woods "at the time he took him up to the third floor" (trial minutes, page 40).

Alexander and O'Neill were each sentenced on December 13, 1961. Alexander was given a suspended sentence on the petit larceny charge and a sentence of five to ten years on the burglary charge. The Court did not consider a prior Maryland conviction to be a felony and Alexander was not sentenced as a second felony offender.

An appeal was taken for Alexander to the Appellate Division, Second Department, where he was represented by Leon B. Polsky, Esq., of the Legal Aid Society. The conviction was unanimously affirmed on April 15, 1963. People v.

Alexander, 18 A.D.2d 364, 239 N.Y.S.2d 364. Violation of constitutional rights at the trial (the same claim now made here) was argued to the Appellate Division but not considered on the merits because it had not been raised at the trial. Leave to appeal to the Court of Appeals was denied by Chief Judge Desmond.

It should first be determined whether Alexander has exhausted his state court remedies (28 U.S.C. § 2254).

Certainly there is no more direct appeal, leave to appeal to the Court of Appeals of New York having been denied.

Since Alexander is not claiming a refusal of the state court to grant counsel "adequate time in which to prepare a defense", a writ of error coram nobis under People v. Silverman, 3 N.Y.2d 200, 165 N.Y.S.2d 11, 144 N.E.2d 10 (1957) is of no value to him.

█ A writ of error coram nobis to review his constitutional claims is not available in the state courts because these claims could have been made by objection in the trial court and then reviewed on direct appeal. People v. Howard, 12 N.Y.2d 65, 236 N.Y.S.2d 39, 187 N.E.2d 113 (1962).

> "It would introduce confusion in the administration of justice if defenses or objections which might have been made and reviewed on appeal could be reserved as grounds for collateral attack upon the judgment of conviction years after it was rendered." 12 N.Y.2d at 68, 236 N.Y.S.2d at 43, 187 N.E.2d at 116.

█ I must conclude that state court remedies have been exhausted.

But the reason why the constitutional claims were not considered by the state appellate court was that no objection was made at trial by counsel apparently freely chosen by Alexander.

█ Can it be said, therefore, that Alexander "deliberately by-passed the orderly procedure of the State courts" or falls within the "classic definition of waiver" (Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963))? This is, of course, a federal question.

After Fay v. Noia, it is difficult to think of any instance where waiver or forfeiture could be found. Noia deliberately and personally, with advice of counsel, chose not to appeal—and for reasons of self-interest. But even such a free decision was held not a waiver.

In the case at bar, Mapp v. Ohio had been decided on June 19, 1961. Petitioner was tried on October 23, 1961. Wong Sun, with its analysis of "verbal evidence" obtained after an "unauthorized arrest" (371 U.S. at 485, 81 S.Ct. 407) and its inclusion of "exculpatory" statements in the holding (371 U.S. at 487, 81 S.Ct. 407), was not to be decided until January 14, 1963. It is doubtful even so that the failure to object can be excused under the doctrine of United States ex rel. Angelet v. Fay, 333 F.2d 12, 16 (2d Cir.1964), namely, that waiver cannot be found in a failure to object where at the time the law required overruling the objection. Neither the majority nor the minority in Wong Sun viewed the decision as changing pre-existing law as to the exclusion of statements, exculpatory or otherwise, after an illegal arrest. The difference in the Court was over the legality or no of the arrest, that is, whether there was probable cause.

The record indicates that Alexander did not participate in the decision of counsel whether to object to the questions asked by the prosecution of officer Woods at the trial as to the exculpatory statements by Alexander. It appears that the failure to object was the result of a routine decision by trial counsel during trial.

Alexander testified at the hearing on this petition that he had learned of the Mapp v. Ohio decision before the state court trial, that while officer Woods was testifying at the state court trial he (Alexander) asked his counsel "to assert the Mapp decision" (SM 82), that he (Alexander) "didn't hear no more about it" (SM 82), that he stood up "to try to object myself" but "was told by the

Court to be seated and let my counsel talk for me" (SM 82). I am unable to credit this testimony, in particular because the stenographic minutes of the state court trial do not reflect anything about Alexander trying to object and being admonished by the Court.

In any event, whether Alexander is in this respect believed or not, the record does not show that failure to object was "the considered choice of the petitioner", as Fay v. Noia requires for any waiver. (372 U.S. at 439, 83 S.Ct. at 849)

Moreover, Fay v. Noia places denial of relief on the ground of waiver within "a limited discretion in the federal judge" (372 U.S. at 438, 83 S.Ct. at 848). I would not here exercise that "limited discretion" to deny relief.

The petition is properly to be considered therefore on its merits.

The claim for petitioner is that he "was clearly under arrest prior to entering 503 Clinton and possibly under arrest from the moment he was stopped by Officer Woods" (Memorandum for Petitioner, page 8). The further claim is that this arrest, being made at a time when concededly there was no probable cause for an arrest, was illegal; and that statements, exculpatory or otherwise, made thereafter could not be used at his state court trial under Mapp plus Wong Sun.

This claim for petitioner is rejected by the Court because contrary to the facts as found. There was no arrest of petitioner until *after* the officers and he had gone into 503 Clinton, had established the falsity of answers given by petitioner to the officers, and had seen that an apartment had been forced open.

Petitioner was not under arrest when he made the statements to which officer Woods testified at the state court trial. He was not then restrained of his liberty. The officers did nothing to require or compel Alexander to do or to say anything. On the contrary, they asked questions and invited, but did not require,

Alexander to accompany them into the apartment house. There was no taking into custody.

The cases cited for petitioner do not sustain his argument that an arrest may be found to have taken place if he merely believed subjectively that "his liberty of movement" was "restricted" and "that as a result he submitted to the officers' authority and accompanied them" (Memorandum for Petitioner, page 8). For example, there is no discussion of any such principle in Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1958). On the contrary in that case federal agents actually stopped an automobile and the government conceded that an arrest took place when the car was stopped. Even so, two dissenting justices felt that the Court should not be "bound by the Government's mistakes" (361 U.S. at 105, 80 S.Ct. 168).

The case at bar is much closer to situations where detention for questioning and even frisking has been recognized as proper on mere suspicion only and has been distinguished from an arrest. United States v. Vita, 294 F.2d 524, 528–532, especially 529–530 (2d Cir. 1961), cert. denied 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788 (1962); United States v. Bonanno, 180 F.Supp. 71, 78–81 (S.D.N.Y.1960), reversed on other grounds under name United States v. Bufalino, 285 F.2d 408 (2d Cir.1960); People v. Rivera, 14 N.E.2d 441, 201 N.E.2d 32, 252 N.Y.S.2d 458 (1964); Leagre, The Fourth Amendment and the Law of Arrest, 54 J.Crim.L., C. & P.S. 393, 406 et seq. (1963). See N.Y.Code Crim.Proc. § 180-a.

In the case at bar, there was far less than what would be permitted under the authorities cited. There was no stopping, no detaining and no frisking. There was only questioning.

There was no arrest prior to the making of the statements admitted at the state court trial. Wong Sun v. United States, above, is not applicable.

The petition is denied and the writ dismissed.

The Court expresses its thanks to assigned counsel, Joshua N. Koplovitz, Esq., of The Legal Aid Society, for assistance to the Court through able representation of the petitioner.

If an appeal is desired, a certificate of probable cause will be issued. 28 U.S.C. § 2253.

So ordered.